2019 WL 4675000
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Robyn COVINO, Plaintiff,

v.

SPIRIT AIRLINES, INC., Defendant.

Civil Action No. 19-10126-NMG
|
Signed 09/25/2019

**Synopsis**
**Background:** Airline passenger brought pro se Massachusetts state court action against airline for intentional and negligent infliction of emotional distress based upon flight attendant's allegedly abrasive denial of passenger's request to use in-flight lavatory. After removal, airline moved to dismiss claims as preempted by federal Airline Deregulation Act (ADA) and as untimely under limitations provision of airline's contract of carriage.

**Holdings:** The District Court, Nathaniel M. Gorton, J., held that:

[1] ADA preempted claims, and

[2] as matter of apparent first impression, "clickwrap" contract to which passenger had agreed when buying ticket on airline's online booking page had under United States Department of Transportation (DOT) regulations provided adequate notice of limitations provision.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (12)

**[1]** **Aviation** 👉 Regulation in general

The key phrase in understanding the scope of the Airline Deregulation Act's (ADA) preemption provision is "relating to"; "relating to," in the context of the ADA, expresses a broad preemptive purpose, encompassing all state laws having a connection with, or reference to, airline rates, routes, or services. 49 U.S.C.A. § 41713(b)(1).

**[2]** **Aviation** 👉 Regulation in general

Airline Deregulation Act (ADA) preemption is not limited to statutes or regulations. 49 U.S.C.A. § 41713(b)(1).

**[3]** **Aviation** 👉 Regulation in general

**Carriers** 👈 Duties as to transportation in general

Providing access to an in-flight lavatory is a necessary service appurtenant to passenger air transportation, under the Airline Deregulation Act's (ADA) preemption provision. 49 U.S.C.A. § 41713(b)(1).

**[4]** **Damages** 👈 Preemption

Emotional distress allegedly suffered by airline passenger was sufficiently related to access to in-flight lavatory such that, insofar as such access was service within meaning of Airline Deregulation Act's (ADA) preemption provision, ADA preempted passenger's pro se claims against airline for intentional and negligent infliction of emotional distress under Massachusetts law, where claims alleged distress resulting from flight attendant's purportedly abrasive denial of passenger's request to use in-flight lavatory. 49 U.S.C.A. § 41713(b)(1).

**[5]** **Damages** 👈 Preemption

**States** 👈 Particular cases, preemption or supersession

Airline Deregulation Act (ADA) preempted airline passenger's pro se claims against airline for intentional and negligent infliction of emotional distress under Massachusetts law to extent that claims complained that flight attendant had reported passenger to authorities at destination airport to be removed from flight prior passenger de-boarding. 49 U.S.C.A. § 41713(b)(1).

**[6]** **Carriers** 👈 Fares, charges, and tickets in general

The adequacy of notice of any term, incorporated by reference in an airline ticket, of the contract for providing interstate air transportation, turns on whether the incorporation by reference of important legal rights was reasonably communicated to the passenger. 14 C.F.R. §§ 253.4(a), 253.5(a).

**[7]** **Carriers** 👈 Fares, charges, and tickets in general

The reasonable communicativeness test, for the adequacy of notice of any term, incorporated by reference in an airline ticket, of the contract for providing interstate air transportation, is a two-pronged analysis that requires a court to consider (1) the facial clarity of the contract and whether it makes the relevant provisions sufficiently obvious and understandable and (2) whether the circumstances of the passenger's possession of and familiarity with the ticket indicate the passenger had the ability to become meaningfully informed of the contractual terms at stake. 14 C.F.R. §§ 253.4(a), 253.5(a).

**[8]** **Carriers** 👈 Validity of contract and assent of passenger thereto

Airline's contract of carriage made its provision which set limitations period for claims against airline sufficiently obvious and understandable, as prong for passenger to have received, under United States Department of Transportation (DOT) regulations, adequate notice that such provision was incorporated in her ticket by reference, where provision was plainly labeled "Time Limit" and explained in clear language that any claim against airline had to be brought within six months of alleged incident. 14 C.F.R. §§ 253.4(a), 253.5(a).

**[9]** **Carriers** 👈 Validity of contract and assent of passenger thereto

Airline passenger had possessed ability to become meaningfully informed of provision of airline's contract of carriage (COC) which set limitations period for claims against airline, as prong for passenger to have received, under United States Department of Transportation (DOT) regulations, adequate notice that such provision was incorporated in her ticket by reference; passenger had agreed to "clickwrap" contract by purchasing ticket through airline's online booking page, a page which unambiguously explained in plain language that by checking box indicating her agreement to airline's terms and conditions, passenger was agreeing to COC, whose complete text was available to passenger via hyperlink on same online booking page, and airline further provided access to COC on its public website. 14 C.F.R. §§ 253.4(a), 253.5(a).

**[10]** **Carriers** 👉 Fares, charges, and tickets in general

Airline provided to passenger even more substantial notice of terms incorporated in its contract of carriage (COC) than notice required by United States Department of Transportation (DOT) regulations requiring that airline make full text of its COC available for public inspection at each of its airport and city ticket offices and provide copy of full text of COC to passengers free of charge, where, as opposed to simply providing passenger with information as to how she could obtain copy of COC at airport, airline provided passenger, who purchased ticket through airline's online booking page, with immediate and direct access to full terms of COC free of charge via hyperlink on airline's online booking page. 14 C.F.R. § 253.4.

**[11]** **Limitation of Actions** 👉 Agreements as to period of limitation

In both Florida and Massachusetts parties may not limit an applicable statute of limitations by contract. Fla. Stat. Ann. § 95.03.

**[12]** **Carriers** 👉 Rights of action and defenses

**States** 👉 Carriers; railroads

A limitation on the period during which a passenger must bring a claim against an airline is preempted by the Airline Deregulation Act (ADA) with respect to airline services and expressly authorized by United States Department of Transportation (DOT) regulations; consequently, such limitations cannot be displaced by state law. 49 U.S.C.A. § 41713(b)(1); 14 C.F.R. § 253.5(b)(2).

**Attorneys and Law Firms**

Robyn Covino, Revere, MA, pro se.

Brandon L. Arber, White and Williams LLP, Richard L. Campbell, Shook Hardy & Bacon LLP, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, J.

**\*1** Robyn Covino ("plaintiff" or "Covino"), proceeding pro se, brings claims for intentional and negligent infliction of emotional distress against Spirit Airlines, Inc. ("defendant" or "Spirit").

Pending before this Court is the motion of Spirit to dismiss plaintiff's complaint on all counts.

### I. Background

Robyn Covino avers that she was a passenger on a Spirit flight from Las Vegas to Boston in April, 2017. During the flight, Covino attempted to use the lavatory. She claims that a Spirit flight attendant stopped her from doing so by yelling, cursing and blocking her passage. Covino does not allege why she believes she was denied access but Spirit asserts that the lavatory was temporarily unavailable because it was occupied by another passenger or crew member.

Following the altercation, the flight attendant reported plaintiff and the incident to Boston International Logan Airport ("Logan"). Upon arrival at Logan, Covino was escorted off the plane and questioned by Massachusetts State Police Officer Gendreau ("Officer Gendreau") before other passengers could disembark. Plaintiff alleges that Officer Gendreau questioned her about the incident and then provided her with his contact information.

Covino purchased her ticket to Boston through Spirit's "ticketless" online booking system. In doing so, she checked a box acknowledging her agreement with the terms and conditions set forth in Spirit's Contract of Carriage ("COC"). The full text of the COC was made available to Covino via a hyperlink on Spirit's booking system. The COC is also published and publicly available on Spirit's website.

Covino filed the instant suit against Spirit in Massachusetts Superior Court in December, 2018. In January, 2019, Spirit removed the case to this Court. Covino seeks damages for intentional and negligent infliction of emotional distress arising out of the flight attendant's conduct in denying her access to the lavatory.

### II. Motion to Dismiss

Spirit moves to dismiss plaintiff's complaint as preempted by the Airline Deregulation Act of 1978 and as time-barred by Spirit's COC.

#### A. Standard of Review

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In considering the merits of a motion to dismiss, the Court may only look to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. Nollet v. Justices of Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000).

Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. See Nollet, 83 F. Supp. 2d at 208.

**\*2** Although a court must accept as true all the factual allegations in a complaint, that doctrine is not applicable to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Threadbare recitals of legal elements which are supported by mere conclusory statements do not suffice to state a cause of action. Id. Accordingly, a complaint does not state a claim of relief where the well-pled facts fail to warrant an inference of any more than the mere possibility of misconduct. Id. at 1950.

**B. Preemption Under the Airline Deregulation Act of 1978**

Spirit moves to dismiss plaintiff's complaint as preempted by the Airline Deregulation Act of 1978.

The Airline Deregulation Act of 1978 ("the ADA") preempts state law with respect to pricing, routes and services of carriers that provide interstate air transportation.  49 U.S.C. § 41713(b)(1). Congress enacted the ADA, in part, "[t]o ensure that the States would not undo federal deregulation" of the airline industry. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). To that effect, Congress expressly preempted the states from

> enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier

49 U.S.C. § 41713(b)(1).

[1] [2] The "key phrase" in understanding the scope of the ADA's preemption provision is "relating to." Morales, 504 U.S. at 383, 112 S.Ct. 2031. "Relating to," in the context of the ADA expresses a "broad preemptive purpose," encompassing all state laws "having a connection with, or reference to, airline rates, routes, or services." Id. at 384, 112 S.Ct. 2031; see also Altria Grp., Inc. v. Good, 555 U.S. 70, 85, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (commenting on the "unusual breadth" of the ADA's preemption provision). ADA preemption is not limited to statutes or regulations; the Supreme Court has interpreted the phrase "other provision having the force and effect of law" to include state common-law claims. Northwest, Inc. v. Ginsberg, 572 U.S. 273, 284, 134 S.Ct. 1422, 188 L.Ed.2d 538 (2014).

Here, Spirit argues that the ADA preempts state-law tort claims arising out of its flight attendant's allegedly abrasive denial of plaintiff's request to use the lavatory. To determine whether plaintiff's claims are preempted, the Court must determine (1) whether access to the in-flight lavatory is a "service" within the meaning of the ADA and (2) whether the emotional distress allegedly suffered by plaintiff is sufficiently "related to" that service.

With respect to the first consideration, a "service," although never defined by the Supreme Court, has been defined broadly in this Circuit as an "anticipated provision of labor from one party to another," including matters "appurtenant and necessarily included with the contract of carriage between the passenger and the airline," such as ticketing, boarding, providing food and drink and handling baggage. Tobin v. Federal Express Corp., 775 F.3d 448, 453-56 (1st Cir. 2014).

[3] This Court readily concludes that providing access to an in-flight lavatory is a necessary service appurtenant to passenger air transportation. See Air Transp. Ass'n of Am. v. Cuomo, 520 F.3d 218, 222 (2d Cir. 2008)("[W]e have little difficulty concluding that requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays relates to the service of an air carrier.").

[4] As to the second consideration, plaintiff maintains that state tort law governing her claims of emotional distress is not sufficiently related to the provision of lavatory services.

*3 Plaintiff relies on Gill v. Jetblue Airways Corp. to maintain that her tort claims are peripheral to an airline service and, thus, not preempted by the ADA. 836 F. Supp. 2d 33 (D. Mass. 2011). In Gill, a quadriplegic passenger sued an airline for negligence after he fell while airline employees assisted him into his seat. Id. at 36-37. The incident occurred during

the boarding process, which is a service under the ADA. See Tobin, 775 F.3d at 456. The Court held that the ADA did not, however, preempt the passenger's claim of negligence because the related "service" of general passenger boarding was only tangentially related to the failure of airline employees properly to exercise their duty of care in helping a disabled passenger into his seat. Gill, 836 F. Supp. 2d at 43. Put differently, the enforcement of the duty of care owed by airline employees to the disabled passenger would have only incidental effect on the boarding process and would not likely restrain the ability of airlines to compete in providing that service. Id.

Gill is distinguishable because Ms. Covino's alleged injury, unlike the injury in Gill, is inextricably related to Spirit's provision of passenger services. The denial of access to the in-flight restroom is at the heart of Covino's claim. Her attempt to sever the manner in which she was denied access to the lavatory from the denial itself is unpersuasive. See Cannava v. USAir, Inc., No. 91-30003, 1993 WL 565341, *6 (D. Mass. Jan. 7, 1993) (allowing motion to dismiss because plaintiff's claims were based on the core allegation that airline agents acted in a rude, insulting, and discourteous manner toward him in the provision of services). Allowing Covino's claim for emotional distress arising from the manner in which she was denied access to a service would upend the ADA's preemption of all claims "related to" the provision of airline services.

**[5]** To the extent Covino complains that the flight attendant reported her to the authorities at Logan to be removed prior to passenger de-boarding, her claim is also preempted. See Dogbe v. Delta Airlines, Inc., 969 F. Supp. 2d 261, 276 (E.D.N.Y. 2013) ("There can be no question that plaintiff's challenge to Delta's ... boarding procedures ... is preempted by the ADA.").

In short, Covino's claims of emotional distress based on the flight attendant's behavior toward her are inextricably related to the flight attendant's denial of an airline service. Accordingly, Covino's claims are preempted by the ADA and Spirit's motion to dismiss will be allowed.

### C. COC Time Limitation

Spirit moves to dismiss plaintiff's complaint for the separate reason that it was untimely. Plaintiff responds that she filed her complaint within the statute of limitations period provided by state law and the shortened limitations period included in Spirit's COC is unenforceable because 1) Spirit provided insufficient notice and 2) state law precludes parties from shortening the applicable statute of limitations by contract.

### 1. Notice

The United States Department of Transportation ("DOT") is charged with promulgating comprehensive regulations interpreting the ADA. 49 U.S.C. § 40113. Pursuant to that regulatory authority, DOT has promulgated regulations aimed at standardizing contracts of carriage. 14 C.F.R. § 253.1 ("The purpose of this part is to set uniform disclosure requirements, which preempt any State requirements on the same subject, for terms incorporated by reference into contracts of carriage for scheduled service in interstate and overseas passenger air transportation.").

DOT regulations provide that an airline carrier may incorporate by reference in a ticket "any term of the contract for providing interstate air transportation," if proper notice is provided. 14 C.F.R. §§ 253.4(a), 253.5(a). Terms that may be incorporated by reference include limitations on liability such as "time periods within which passengers must file a claim or bring an action against the carrier to its acts or omissions." 14 C.F.R. § 253.5(b)(2).

**\*4** **[6]** **[7]** The adequacy of notice turns on whether the incorporation by reference of important legal rights was "reasonably communicate[d]" to the passenger. Shankles v. Costa Armatori, S.P.A., 722 F.2d 861, 864 (1st Cir. 1983). The reasonable communicativeness test is a two-pronged analysis that requires the Court to consider 1) the facial clarity of the contract and whether it "make[s] the relevant provisions sufficiently obvious and understandable" and 2) whether the "circumstances of

the passenger's possession of and familiarity with the ticket," indicate the passenger had the ability to become "meaningfully informed of the contractual terms at stake." [icon] Lousararian v. Royal Caribbean Corp., 951 F.2d 7, 8-9 (1st Cir. 1991).

**[8]**  With respect to the first prong, Section 13.3 of Spirit's COC is plainly labeled "Time Limit" and explains in clear language that any claims against Spirit must be brought within six months of the alleged incident. Such a straightforward and conspicuously labelled provision is sufficiently clear to meet the "reasonableness" standard. [icon] Id. at 10 ("[T]he standard is one of reasonableness, not perfection.").

**[9]**  With respect to the second prong, Spirit's online booking page explains in plain language that by assenting to Spirit's terms and conditions by checking the relevant box, the passenger is agreeing to Spirit's COC. Spirit then provides on the same page a link to the complete text of the COC to which the passenger is agreeing. Courts have referred to this online process as creating a "clickwrap" contract. See, e.g., [icon] Cullinane v. Uber Technologies, Inc., 893 F.3d 53, 63 n.10 (1st Cir. 2018) (explaining that a "clickwrap" contract requires a user to indicate affirmative assent to a contract but does not require the user to view the contract to which she is assenting).

Although this Court is unaware of any federal court that has considered whether a "clickwrap" contract provides sufficient notice of contractual provisions incorporated by reference under 14 C.F.R. § 253.5, courts in this Circuit are in near universal agreement that clickwrap contracts are enforceable in other contexts. See, e.g., Wickberg v. Lyft, Inc., 356 F. Supp. 3d 179, 183 (D. Mass. 2018) ("[C]lickwrap agreements ... are generally held enforceable."); [icon] Small Justice LLC v. Xcentric Ventures LLC, 99 F. Supp. 3d 190, 196 (D. Mass. 2015) ("Clickwrap agreements are generally upheld because they require affirmative action on the part of the user."); see also Mark A. Lemley, Terms of Use, 91 Minn. L. Rev. 459, 466 (2006)("Because the user has 'signed' the contract by clicking 'I agree,' every court to consider the issue has held clickwrap licenses enforceable.").

Here, Spirit unambiguously stated on its online booking page that by checking the box indicating her agreement to Spirit's terms and conditions, Covino was agreeing to Spirit's COC. The full text of the COC was available to Covino via hyperlink on that same booking page and Spirit further provided access to the COC on its publicly accessible website.

Through each of these technological mechanisms, Spirit provided Covino an opportunity to become fully informed of the contractual provisions to which she was agreeing by booking her air travel with Spirit. That Spirit failed to provide Covino with a paper copy of its COC or a paper ticket which included the COC provisions is immaterial. See Ticketless Traveler: Passenger Notices, 62 Fed. Reg. 19,473-477 (April 22, 1997) (recognizing the emergence of "ticketless travel" and rejecting the notion that airline companies are required to provide paper notices to ticketless passengers).

 **\*5**  **[10]**  Equally important is whether Spirit has complied with the notice requirements of incorporated terms provided by DOT regulations. 14 C.F.R. § 253.4. Specifically, DOT requires that an airline make the full text of its COC available for public inspection at each of its airport and city ticket offices and provide a copy of the full text of the COC to passengers free of charge. 14 C.F.R. §§ 253.4(b), (c). In this case, Spirit provided to Covino even more substantial notice of the terms incorporated in its COC than required by the regulations. As opposed to simply providing Covino with information as to how she could obtain a copy of the COC at the airport, Spirit provided Covino with immediate and direct access to the full terms of the COC free of charge via hyperlink on the booking page.

In sum, Spirit's online ticketless booking system reasonably provided Covino notice of the existence of important legal rights incorporated by reference in Spirit's contract of carriage, including its limitation of liability requiring all claims against Spirit to be brought within six months.

**2. State Law**

Plaintiff next contends that even if she was provided proper notice of the incorporated COC terms, the claim limitations period is unenforceable under applicable state contract law. Plaintiff claims that under either Florida law, which may govern pursuant to the COC's choice of law provision, or Massachusetts law, contractually shortened limitations periods are invalid.

 **[11]**   Ms. Covino is correct that in both Florida and Massachusetts parties may not limit the applicable statute of limitations by contract. See Fla. Stat. § 95.03 ("Any provision in a contract fixing the period of time within which an action arising out of the contract may be begun at a time less than that provided by the applicable statute of limitations is void."); Creative Playthings Franchising, Corp. v. Reiser, Jr., 463 Mass. 758, 978 N.E.2d 765, 770 (Mass. 2012) ("Any contractual reduction in a limitations period that is unreasonable or not subject to negotiation by the parties, such as in a contract of adhesion, will be unenforceable.").

 **[12]**   A limitation on the period during which a passenger must bring a claim against an airline carrier is, however, preempted by the ADA with respect to airline services as discussed above and expressly authorized by DOT regulations. 14 C.F.R. § 253.5(b) (2). Consequently, such limitations cannot be displaced by state law. See, e.g., Miller v. Delta Air Lines, Inc., No. 4:11-cv-10099, 2012 WL 1155138, *4 (S.D. Fla. Apr. 5, 2012) ("Plaintiff cannot use Florida law to expand Delta's undertaking in the Contract of Carriage by exposing it to claims made within five years, rather than the one-year expressly provided in the Contract of Carriage."); O'Connell v. Paquet Cruises, Inc., No. 88-1481-MC, 1989 WL 83205, *2 (D. Mass. July 7, 1989) (enforcing a cruise ship's contractually shortened claim limitations period incorporated by reference in its contract of carriage).

Consequently, the six-month limitations period in Spirit's COC, which was properly incorporated by reference through Spirit's online "ticketless" booking system, applies to plaintiff's claims. The incident giving rise to plaintiff's complaint occurred on a Spirit Airlines flight in April, 2017 but plaintiff did not file the instant lawsuit until December, 2018. Plaintiff's complaint is, therefore, time barred. Accordingly, Spirit's motion to dismiss plaintiff's complaint will be allowed on time limitation grounds as well as preemption.

**ORDER**

For the forgoing reasons, the motion of Spirit Airlines, Inc. to dismiss Ms. Covino's complaint (Docket Entry No. 7) is **ALLOWED.**

**So ordered.**

**All Citations**

--- F.Supp.3d ----, 2019 WL 4675000

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1463580
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Sandra EDICK, individually and as Special Administrator for the Estate of Phillip Edick, deceased, Plaintiff,

v.

ALLEGIANT AIR, LLC, et al., Defendants.

No. 2:11–CV–259 JCM (GWF).
|
April 27, 2012.

**Attorneys and Law Firms**

David F. Sampson, Thomas F. Christensen, Christenson Law Offices, Chtd., Las Vegas, NV, for Plaintiff.

**ORDER**

JAMES C. MAHAN, District Judge.

**\*1** Presently before the court is defendant Allegiant Air, LLC's motion for summary judgment. (Doc. # 34). Plaintiff Sandra Edick filed an opposition. (Doc. # 38). Defendant then filed a reply. (Doc. # 41).

This lawsuit arises out of an incident at McCarran International Airport in which plaintiff's husband, Phillip Edick, fell and hit his head as he was entering the airport terminal. (Doc. # 1). The Edicks had airplane reservations to fly from Las Vegas to Eugene, Oregon.

Mr. Edick was diagnosed with astrocytoma, a brain tumor, in 1996. Before his fall at the airport, Mr. Edick already had developed conditions associated with his brain tumor, including confusion, poor short-term memory, headaches, and physical weakness.

On October 23, 2008, plaintiff drove to the airport and parked on the fourth floor of the longterm parking garage. As the Edicks were walking to the airport terminal, Mr. Edick fell in the longterm parking garage and was shaken. Plaintiff then asked Mr. Edick to stay on a bench on a lower level of the parking garage while she went to the check-in counter. Plaintiff left Mr. Edick and went to the check-in counter with the couple's baggage.

At the Allegiant Air check-in counter, plaintiff asked to check in the bags for Phillip and Sandra Edick. The Allegiant Air agent at the check-in counter refused to check in the luggage because Mr. Edick was not present in the terminal. Plaintiff informed the Allegiant Air agent that: (1) Mr. Edick was a disabled passenger who needed a wheelchair, (2) Mr. Edick had fallen in the parking garage already, (3) plaintiff needed assistance with Mr. Edick, and (4) she wanted to leave her baggage at the counter while she returned to help Mr. Edick. The Allegiant Air agent responded that plaintiff could not leave unattended luggage at the airport and that plaintiff would have to take the luggage with her when she went to assist Mr. Edick.

Plaintiff returned to the parking garage to meet her husband. The Edicks then walked toward the airport terminal with their bags on a cart. At the curb, Mr. Edick let go of the baggage cart and began to talk to the automatic doors to enter the airport terminal. Mr. Edick fell and hit his head after he passed the first of the two sets of automatic doors. As a result of the fall, Mr. Edick lost a tooth, sustained a gash under his eye, and suffered brain hemorrhaging. Mr. Edick spent eight days at Sunrise Hospital after this fall.

The complaint alleges two causes of action: (1) negligence and (2) loss of consortium. (Doc. # 1). Defendant moves for summary judgment. (Doc. # 34). Defendant first argues that plaintiff's claims are preempted by federal law. Further, even if plaintiff's claims are not preempted, defendant argues that it owed no duty of care to plaintiff and Mr. Edick, and summary judgment is appropriate.

### Summary judgment standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996); FED. R. CIV. P. 56(c); *see also* *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *T.W. Elec. Serv ., Inc. v. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586; *International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

**\*2** The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also* *Orr v. Bank of America,* 285 F.3d 764 (9th Cir.2002) (expressing the standard for authentication of evidence on a motion for summary judgment). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answer to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324; FED.R.CIV.P. 56(c).

### I. Federal Aviation Act ("FAA") and Air Carrier Access Act ("ACAA")

Defendant first moves for summary judgment, arguing that all of plaintiff's claims are preempted by federal law. The allegations in the complaint revolve around two alleged breaches of duty by defendant: (1) defendant's failure to provide wheelchair assistance to Mr. Edick, and (2) defendant's failure to accept the plaintiff's baggage at the check-in counter.

"The purpose, history, and language of the FAA [demonstrate] that Congress intended to have a single, uniform system for regulating aviation safety." *Montalvo v. Spirit Airlines,* 508 F.3d 464, 471 (9th Cir.2007). The Federal Aviation Administration may develop regulations which "displace all state law on the subject of air safety." *Id.* To determine whether a particular state law claim is preempted, the court determines whether the Federal Aviation Administration has issued "pervasive regulations" in that area. *Martin v. Midwest Exp. Holdings, Inc.,* 555 F.3d 806, 811 (9th Cir.2009). "In areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." *Id.*

#### A. Failure to provide wheelchair assistance

The instant motion for summary judgment argues that plaintiff's wheelchair-related claims are preempted by the ACAA. (Doc. # 34). Specifically, defendant argues that federal regulations require wheelchair assistance for passengers only when boarding or deplaning, when connecting with flights between terminals, and when moving from the terminal entrance or vehicle drop-off point to the gate. (Doc. # 34, citing 14 CFR 382.39; 14 CFR 382.91; and 14 CFR 382.95). Thus, there are pervasive regulations regarding wheelchair assistance. None of these regulations require wheelchair assistance in a parking garage, and plaintiff's state law claims are preempted. (Doc. # 34).

In response, plaintiff states that the facts of this case do not involve wheelchair assistance for a passenger boarding or deplaning, connecting with flights between terminals, or moving from the terminal entrance or vehicle drop-off point to the gate. *See* 14 CFR 382.39; 14 CFR 382.91; and 14 CFR 382.95. Instead, this is a case involving the failure to provide wheelchair assistance

from a parking garage to the check-in counter. (Doc. # 38). Plaintiff notes that there are no federal regulations governing wheelchair assistance from the parking area to the check-in counter. Accordingly, the field is not preempted in this area of assistance to the disabled, and the court must look to the state law standard of care. (Doc. # 38).

 **\*3**  There are extensive federal regulations governing the wheelchair assistance claims in this case. The regulations promulgated under the ACAA establish with specificity an air carrier's obligations to provide disabled passengers with assistance. *See* *Johnson v. Northwest Airlines, Inc.,* 2010 WL 5564629, at \*5 (N.D.Cal.2010). Plaintiff correctly observes that the federal regulations do not address wheelchair assistance from parking structures to check-in counters, but it does not follow from this observation that the area of wheelchair assistance is not regulated pervasively. *See* *Martin,* 555 F.3d at 811. Pursuant to the ACAA, an air carrier's obligations to provide wheelchair assistance do not extend beyond the areas of the terminal which it controls. Here, the carrier does not control the parking area of the airport. *See* 14 CFR 382.39; 14 CFR 382.91; and 14 CFR 382.95. An air carrier's obligations to provide wheelchair assistance are regulated under the ACAA, and an expansion of these obligations would undermine the "single, uniform system [of] aviation safety." *Montalvo,* 508 F.3d at 471.

Accordingly, the court finds that plaintiff's wheelchair assistance-related claims are preempted by federal law, and summary judgment on these claims is appropriate.

## B. Failure to accept baggage

Similarly, defendant states that baggage check-in is pervasively regulated. Defendant's security plan mandates that Allegiant Air personnel can accept baggage from a family member on behalf of another family member traveling together only if the other family member was within the terminal and could be identified by Allegiant Air personnel. (Doc. # 34). Therefore, plaintiff's baggage check-in claims, including the Allegiant Air agent's failure to check in the Edick's baggage and refusal to allow plaintiff to leave unattended baggage at the check-in counter, are preempted by federal law. (Doc. # 34).

In their response, plaintiffs do not contest that all of defendant's baggage check-in related actions were in compliance with Allegiant Air's Transportation and Security Administrationmandated and approved security plan. (Doc. # 38).

The court finds that baggage check-in is pervasively regulated, and plaintiff's state law baggage check-in claims are preempted by federal law. Therefore, the court grants summary judgment on these claims.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant Allegiant Air, LLC's motion for summary judgment (doc. # 34) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that the clerk of court shall close the above-captioned case and enter final judgment accordingly.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 1463580

---

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Baugh v. Delta Air Lines, Inc., N.D.Ga., February 23, 2015

2010 WL 5564629
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Barbara JOHNSON, Plaintiff,

v.

NORTHWEST AIRLINES, INC., et al, Defendant.

No. C 08–02272 VRW.
|
May 5, 2010.

**Attorneys and Law Firms**

Michael Byron Cohen, Michael Cohen, Attorney at Law, San Francisco, CA, for Plaintiff.

Kymberly E. Speer, Elizabeth D. Rhodes, Jennifer M. Joaquin, Kenney & Markowitz L.L.P., San Francisco, CA, for Northwest Airlines, Inc.

Mary Eileen Reilley, Esq., Owen J. Rescher, Krieg Keller Sloan Reilley & Roman LLP, San Francisco, CA, for Globe Aviation Services Corporation.

ORDER

VAUGHN R. WALKER, Chief Judge.

**\*1** On November 30, 2009, defendant Globe Aviation Services ("Globe") moved for an order granting summary judgment on plaintiff Barbara Johnson's claims against it. Doc # 68. Plaintiff, having concluded that Globe owed her no duty, has filed a statement of non-opposition to Globe's motion "based on lack of evidence on the issue of Globe's duty." Doc # 108 at 4. Globe's motion for summary judgment therefore is GRANTED.

Globe furnished wheelchair services at the Minneapolis–St Paul Airport ("MSP") on the date, July 9, 2005, plaintiff Barbara Johnson arrived there on a flight operated by defendant Northwest Airlines ("NWA"), which also moves for summary judgment. Doc # 61. Plaintiff's first amended complaint ("FAC"), Doc # 42, the operative pleading at bar, alleges but one claim of negligence; jurisdiction is predicated on diversity. 28 USC section 1332. Plaintiff opposes NWA's motion and argues that triable issues of fact exist. Doc # 73. A hearing on NWA's motion was held on March 11, 2010. For the reasons stated below, NWA's motion for summary judgment is GRANTED.

I

Although the parties present conflicting interpretations of some events, the material facts are without dispute, the differing interpretations being simply collateral to the claim plaintiff alleges. Plaintiff was a passenger on an NWA flight from San Francisco International Airport ("SFO") to Dallas–Fort Worth International Airport ("DFW") with a connection at MSP. Plaintiff

alleges that NWA breached its duty when it failed to provide her with wheelchair service at MSP, forcing her to walk to a connecting flight and causing the injuries she sustained when she fell while exiting a moving walkway. Doc # 42 at ¶¶ 13–14.

The undisputed facts, relevant to NWA's motion, are as follows. On July 9, 2005, plaintiff took a red-eye flight from SFO to DFW, with a connection in MSP. Docs # 42; 63–4; 74 at ¶ 4. In making the reservation, plaintiff's daughter requested wheelchair assistance for her mother. Doc # 74 at ¶ 5. NWA noted a "WCHS" request, Doc # 62, Exh E–2 ("passenger can walk short distances, but cannot walk up and down stairs"), Doc # 64 at 2 (Hines Decl). NWA provided plaintiff with a wheelchair in SFO. *Id* at ¶ 7(b). Plaintiff was wheeled to the door of the plane and walked, with a flight attendant's assistance, to her seat. Doc # 63–2 at 48:3–23; Doc # 74 at ¶ 7(b).

Plaintiff's flight arrived at the gate at MSP at 5:58 AM, five minutes before its scheduled arrival of 6:03 AM. Doc # 146–1 at 1. According to plaintiff's deposition testimony, she was the last passenger to deplane. Doc # 63–2. No wheelchair was provided to help plaintiff off the plane, so a flight attendant walked with her up the jetway to the gate and got plaintiff "situated." Doc # 63–2 at B–12. At about then, a gate agent arrived. Id; Doc # 74 at ¶ 8. Plaintiff further explained during her deposition that when she inquired about a wheelchair with the gate agent, the agent replied, "There's nobody here. So I'll see if I can get you one. I don't know if I'm going to be able to get you a wheelchair because there's nobody here." Doc # 63–2 at 66:7–9. In her declaration, plaintiff says simply, "The desk person told me she did not know anything about the wheelchair, and that there was no one there to get a wheelchair for me." Doc # 74 at ¶8(d). Howsoever plaintiff's deposition testimony and her declaration differ, the differences are not material and her deposition testimony, taken five months earlier, controls. See *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 267 (9th Cir.1991); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364 (8th Cir.1983).

**\*2** While plaintiff was waiting at the gate she saw an electric passenger cart and asked the cart driver if he could take her to her connecting flight. Doc # 63–2 at 66:9–24. Plaintiff explained that, "I was thinking in my mind if [the gate agent] can't get a wheelchair, maybe I can get this guy to take me to my connecting flight." *Id* at 66:15–17. The cart driver left, however, before plaintiff was able to board, so plaintiff turned to the gate agent and asked how she could get to her connecting flight. *Id* at 67:24–68:2. At that point, plaintiff did not inquire with the gate agent any further about the wheelchair or about any other electric passenger carts. *Id* at 68:2–17, 73:14–19. The gate agent directed plaintiff towards a moving walkway and told plaintiff it would take her to her next gate. *Id* at 68:3–9; Doc # 74 at ¶ 8(g). Plaintiff stated that it was about ten minutes after 6:00 AM at this point, approximately one hour before her connecting flight departed and just twelve minutes after her flight arrived at the gate. Doc63–2 at 72:6–11; 63–4 & 146–1 at 1.

Plaintiff then walked toward the gate of her connecting flight, stepped onto a moving walkway and, when she got to the end of the walkway, fell. The MSP Airport Police Department, the MSP Airport Fire Department and Allia Medical Transportation each arrived on the scene and generated incident reports. Doc # 63 (Exh G, H, I). Each of those reports indicate that plaintiff fell at 6:12 AM. *Id.* Hence, all of the foregoing undisputed facts occurred within about fourteen minutes of the plane's arrival at the gate, and a mere nine minutes of the plane's scheduled arrival.

## II

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

In reviewing a summary judgment motion, the court must resolve any doubt as to genuine issues of material fact in favor of the nonmoving party. *Dreiling v. American Online Inc.,* 578 F.3d 995, 1000 (9th Cir.2009). If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir.1999).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Carrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Nissan v. Fire & Marine Insurance Company,* 210 F.3d 1099, 1102 (9th Cir.2000). When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322; *TW Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322.

A

 **\*3** Before the court reaches the merits of NWA's motion, it must take up several preliminary issues. First, plaintiff has moved for leave to file a surreply. Doc # 108. Under LR 7–3(d), a party may "bring to the court's attention a relevant judicial opinion published after the date the opposition or reply was filed." Plaintiff, however, requests to do no such thing. Instead, plaintiff simply seeks to file another opposition to NWA's motion. Such a surreply is inappropriate and allowing plaintiff to file her surreply would run contrary to the spirit of the local rule. Plaintiff's motion to file a surreply therefore is DENIED.

Plaintiff also filed fifteen evidentiary objections related to NWA's motion. Doc # 77. Because the court does not rely on the evidence implicated by objections 2–3, 5 and 8–14, it is not necessary for the court to rule on these objections.

Having reviewed the remaining evidentiary objections, the court OVERRULES objections 1, 6, 7 and 15. Plaintiff's first objection reads "[a]ll evidence tending to show that [p]laintiff was capable of walking short distances on the grounds of relevance in that this fact has never been in dispute." Doc # 77 at 1. Plaintiff's ability to walk short distances is relevant to the current dispute. Furthermore, this undisputed evidence is not eligible for exclusion under FRE 403. Plaintiff's first objection therefore is OVERRULED.

Objections 6 and 7 concern statements by the plaintiff made during her deposition. Plaintiff's counsel did not object to the line of questioning during the deposition, but now objects on the basis of relevance, "mis-stating the evidence" and "read[ing] the inferences the wrong way." The court finds that plaintiff's deposition testimony as to what happened when she exited the plane at MSP and while she was speaking with the gate agent is relevant within the meaning of FRE 401. Furthermore, an assertion that NWA has misinterpreted the evidence is not a proper objection, but is simply an argument about what to make of plaintiff's testimony. As to objection 15, the court finds that the incident reports from the MSP Airport Police Department, the MSP Airport Fire Department and Allia Medical Transportation are relevant within the meaning of FRE 401 and are exceptions to the hearsay rule under FRE 803(6) and 803(8). Plaintiff also argues that the reports "mis-state" evidence and that NWA "mis-constru[es] the evidence." Again, these assertions are not proper objections.

As to plaintiff's fourth objection, the court finds that the information contained in paragraph 2 of the declaration of Chuck Hines, which is not the business record in question but rather Mr Hines's recollection of that record, is not an exception to the hearsay rule under FRE 803(6). Doc # 64. Plaintiff's objection 4 therefore is SUSTAINED. NWA, however, has submitted admissible evidence of the time of the flight's scheduled arrival and its actual landing and arrival at the gate. Doc146, 146–1. This evidence, which consists of a printout of electronic signals sent when the pilot of an incoming flight "locks in" to an

arrival gate, indicates that plaintiff's flight, which was scheduled to touch down at 5:58 AM and to arrive at the gate at 6:03 AM, landed early at 5:52 AM and pulled into the gate at 5:58 AM. Doc # 146–1. The printout, however, takes a bit of deciphering, as the times of plaintiff's actual and scheduled landing (marked "ON") and scheduled and actual arrival at the gate (marked "IN") are listed in Greenwich Mean Time, referred to by the United States Navy and civil aviation as "Zulu" time. See Doc # 146; see also http://www.navy.mil/navydata/navy_legacy_hr.asp?id=185. Thus, plaintiff's scheduled arrival at the gate, which reads 1103 on the printout, and plaintiff's actual arrival at the gate, which reads 1058, become 6:03 and 5:58 when corrected to reflect Central Daylight Savings Time.

 **\*4**  NWA also filed six evidentiary objections related to plaintiff's opposition. Doc # 80. As to objections 1 and 3–5, NWA objects to plaintiff's declaration on the grounds that plaintiff attempts to controvert her deposition testimony. While a party cannot create a genuine issue of fact simply by contradicting her own previous testimony, 🔖 *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), NWA's statements constitute argument and not proper grounds for objection. As such, the court overrules these objections. As to objections 2 and 6, the court does not rely on the implicated evidence and so need not rule on these objections.

### B

Under California law the elements of negligence are "duty, breach of duty, causation and damages." *Friedman v. Merck & Co.,* 107 Cal.App.4th 454, 463, 131 Cal.Rptr.2d 885 (2d Dist 2003). NWA contends that plaintiff has presented no triable issues of fact as to NWA's duty to plaintiff or as to any causal relationship between NWA's actions and plaintiff's injury.

In its causation argument, NWA also asserts that there was no breach of duty. Doc # 63 at 12–16. Plaintiff's opposition asserts that NWA owed plaintiff a duty under the terms of its contract with plaintiff, under California common law and under 14 CFR section 382.39. [1] Plaintiff also argues that there is sufficient evidence to prove causation, or at least to put the question before a jury. She does not, however, address the question of breach of duty. Doc # 73. In response, NWA argues that plaintiff's arguments based upon the federal regulations should be rejected as a new theory of liability and because there is no private right of action under 14 CFR section 382.39. NWA also argues that plaintiff's state-law claims are preempted. Doc # 79. The court turns to the issue of NWA's duty.

### 1

The existence of a duty of care is "a question of law to be determined by the court alone." 🔖 *Catsouras v. Dep't of California Highway Patrol,* 181 Cal.App.4th 856, 876, 104 Cal.Rptr.3d 352 (4th Dist 2010) (citations omitted); see also 🔖 *Glenn K Jackson Inc. v. Roe,* 273 F.3d 1192, 1196 (9th Cir.2001). The court first determines: (1) whether plaintiff's reference to the federal regulations should be barred as a new theory of liability not proffered in her complaint; (2) whether the applicable federal regulations allow plaintiff a private right of action; and (3) whether plaintiff's state-law claims are preempted by federal regulations governing aviation safety.

While many courts have held that a plaintiff may not raise new theories in opposition to summary judgment, this court held in *T C* 🔖 *Jefferson v. Chase Home Finance,* 2008 WL 1883484 (N.D.Cal.) (Henderson, J) that a more accurate statement of the law is that a court has discretion in determining whether to allow a new theory of liability to be introduced at summary judgment.

Referring to 🔖 *Coleman v. Quaker Oats Co.,* 232 F.3d 1271 (9th Cir.2000), in which the Ninth Circuit found that a district court did not err in refusing to accept a new theory of liability raised at summary judgment, the *Jefferson* court stated that new theories may be refused when a defendant would suffer prejudice. 🔖 2008 WL 1883484 at \*6. The court went on to explain

that "even where plaintiffs shift gears and set forth an entirely new theory in opposition to summary judgment, some prejudice to defendant must be shown for this court to reject a new theory." *Id.* Applying the *Jefferson* analysis to the instant case, NWA has not shown that plaintiff's reference to federal regulations prejudices NWA in any way. Indeed, NWA has had no difficulty addressing this "new theory," nor does that theory appear to have had any impact on the remainder of NWA's defenses. The court, therefore, will not reject plaintiff's argument as an untimely theory of liability.

**\*5** Notwithstanding, plaintiff has no private right of action under the cited federal regulations. Sections 382.91 and 382.95 are part of federal regulations enacted to carry out the Air Carrier Access Act of 1986 ( 49 USC § 41705) ("ACAA"), and this court has held that a private right of action does not exist under the ACAA. See *Kerner v. Mendez,* C–08–04528 EDL, Doc # 27.

As explained in *Kerner,* the current law on implying a private right of action is expressed in *Alexander v. Sandoval,* 532 U.S. 275, 286–87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), and focuses on congressional intent. While the Ninth Circuit has not addressed the issue of a private right of action under the ACAA since *Sandoval,* other circuits have found there to be none. See *Boswell v. Skywest Airlines,* 361 F.3d 1263, 1270–71 (10th Cir.2004); *Love v. Delta Airlines,* 310 F.3d 1347, 1359 (11th Cir.2002). The courts in *Boswell* and *Love* both highlighted the fact that Congress, which did not express a private right of action under the ACAA, established a comprehensive enforcement mechanism for violations of the act. 49 USC § 46110. Specifically, Congress provided that individuals (such as plaintiff here) can file a complaint with the Secretary of Transportation and then, once the Secretary has heard the complaint, appeal the Secretary's order to the United States Court of Appeals. *Id.* Nowhere in that mechanism is there a private right to sue in a federal district court. *Id.* As in *Kerner,* the court finds that plaintiff's claim under the ACAA fails for lack of a private right of action.

NWA did not raise federal preemption in its motion, but plaintiff broached the issue in her opposition when she argued that "in the 9th Circuit, state common law personal injury claims against airlines are NOT preempted by Federal airline regulations." Doc # 73 at 6. Plaintiff does not provide any analysis of this argument, but includes a parenthetical reference to *Charas v. Trans World Airlines, Inc* 160 F.3d 1259, 1261 (9th Cir.1998), which held that the express preemption clause of the Airline Deregulation Act does not preempt "run-of-the-mill personal injury claims." Responding to this argument, NWA cites *Montalvo v. Spirit Airlines,* 508 F.3d 464 (9th Cir.2007) for the proposition that plaintiff's state-law negligence claims are indeed preempted. Doc # 79 at 3. Although courts generally decline to hear arguments raised for the first time in a reply brief, plaintiff raised the question of preemption in her opposition so NWA deserved an opportunity to reply.

In *Montalvo,* the Ninth Circuit upheld this court's finding in *In re: Deep Vein Thrombosis,* 2005 WL 591241 that the Federal Aviation Act ("FAA") and its corresponding regulations preempt state-law "failure to warn" claims, holding that "federal law preempts the entire field of aviation safety." 508 F.3d at 468. The Ninth Circuit subsequently clarified its *Montalvo* holding in *Martin ex rel Heckman v. Midwest Exp Holdings, Inc,* explaining that the *Montalvo* analysis does not suggest that the FAA preempts all state law personal injury claims but rather rests heavily on the FAA's pervasive regulations of warnings to passengers. 555 F.3d 806, 810 (9th Cir.2009). In dictum, the court said that, were it to have found that the FAA preempts all such claims, its holding in *Charas* would have been rendered moot. 555 F.3d at 811. Instead, the court held that when a federal agency "issues 'pervasive regulations' in an area, like passenger warnings, the FAA preempts all state law claims in *that* area." *Id* at 811 (emphasis in original). The court further stated that when there are no applicable federal regulations, state-law claims are not preempted. *Id.* Accordingly, in *Martin,* the plaintiff's claim that she sustained injuries after falling down faulty air-stairs was not preempted because air-stairs are not heavily regulated; the regulations say nothing about proper handrails or about air-stairs at all, except in emergency landings. *Id.*

**\*6** Unlike *Martin,* however, there are extensive federal regulations governing the area of the claims in this case. The regulations promulgated under the ACAA, which implicate both safety and non-discrimination mandates, establish with specificity an air carrier's obligations to provide disabled passengers with assistance "as needed" in deplaning and to ensure disabled passengers

are provided with "transportation between gates to make a connection" as requested. 14 CFR § 382.95(a); 14 CFR § 382.91. This extensive regulation is of the sort contemplated by the Ninth Circuit in *Martin* and *Montalvo,* implying an intent by Congress to preempt state-law in this area. Plaintiff's state-law claims, then, are preempted by the ACAA.

Plaintiff asserts in her opposition that NWA owes a "duty against negligently fulfilling [its] promise" and a "duty created by undertaking to provide service." Doc # 73 at 4 n1. Plaintiff, however, provides limited argument supporting these propositions, confining her analysis to two lengthy string citations located in a footnote of her opposition. *Id.* Other than *Lagrois v. United Airlines,* 1987 U.S. Dist LEXIS 15518 (E D MI), an Eastern District of Michigan case, and *Kelly v. United Airlines,* 986 F.Supp. 684 (D.Ma.1997), a District of Massachusetts case, none of the cases cited by plaintiff addresses the duty of care owed by air carriers to their passengers or explain how the common-law duties of care would be applicable to this case. Because plaintiff's state-law negligence claims are preempted by the ACAA, and because the ACAA contains no express or implied private right of action in the district court, NWA is entitled to judgment as a matter of law.

### 2

Even if plaintiff's claims were not preempted by the ACAA, and further if that act allowed a private right of action, plaintiff's claims would still fail. NWA satisfied its initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate an absence of a genuine issue of material fact as to breach of duty and causation. Therefore, plaintiff must show, through affidavits or discovery of her own, specific facts establishing that there is a genuine issue for trial. See *Celotex Corp.,* 477 U.S. at 322. Although summary judgment in tort cases is rare because breach and causation are typically questions of fact reserved for jury resolution, breach and causation become questions of law where under undisputed facts reasonable minds could not differ on the outcome. See, e g, *Evanston Ins. Co. v. OEA, Inc.,* 566 F.3d 915, 920 (9th Cir.2009) (citations omitted); *Iolab Corp. v. Seaboard Sur. Co.,* 15 F.3d 1500, 1506 (9th Cir.1994).

### a

It is undisputed that plaintiff's flight from SFO, which was scheduled to arrive at 6:03 AM, arrived at the gate at 5:58 AM, that she was the last passenger to deplane, that she left the gate to reach her connecting flight around 10 minutes after 6:00 AM and that she fell at 6:12 AM, less than fifteen minutes after her flight reached its arrival gate. Further, in her deposition, plaintiff says that the gate agent told her, "I'll see if I can get you one. I don't know if I'm going to be able to get you a wheelchair because there's nobody here." Doc # 63–2 at 66:7–9. While plaintiff's declaration says simply that the agent told her that "she did not know anything about the wheelchair, and that there was no one there to get a wheelchair for me," (Doc # 74 at ¶ 8(d)), as noted above the court finds that these two statements are not in conflict and do not create a genuine issue as to a material fact (and, in any event, plaintiff cannot create a dispute of fact by providing two versions of the same event).

**\*7** Both statements confirm that when plaintiff got off the plane at MSP there was no wheelchair waiting for her. Nothing in either of these statements, however, or in any of the other evidence presented, suggests that NWA denied or refused to provide plaintiff with a wheelchair. Rather, the evidence suggests that, at the moment plaintiff decided to leave the gate, the wheelchair's delivery was delayed but still possible. Plaintiff acknowledged that she knew someone from NWA may still bring her a wheelchair when she explained that, as she saw the electric passenger cart passing by, "I was thinking in my mind if [the gate agent] can't get a wheelchair, maybe I can get this guy to take me to my connecting flight." Doc # 63–2 at 66:15–17. When the cart left without her, however, plaintiff "didn't ask [the gate agent] anything else." *Id* at 73:17. In other words, she did not inquire any further about the wheelchair or passenger cart, but instead left for the connecting gate on her own. This was at "about ten after 6:00." Doc # 63–2 at 72:6–11. And at that point, which was a mere seven minutes after her flight was scheduled to arrive, no more than twelve minutes had passed since her flight from SFO arrived at the gate and, based on plaintiff's admission that she was the last person to deplane, still less time from her disembarkment.

While the court finds no reported cases in this district addressing a similar fact pattern, other jurisdictions provide guidance. In *Adiutori v. Sky Harbor Int'l Airport,* the district court granted summary judgment for the defendant when a passenger who suffered a myocardial infarction had waited between five and ten minutes for a wheelchair, was wheeled to a shuttle bus stop where he waited without a wheelchair and then got on and off the shuttle bus without assistance. 880 F.Supp. 696, 699–700 (D.Ariz.1995), aff'd without opinion 103 F.3d 137 (9th Cir.1996). The *Adiutori* court held that defendants' failure to provide a wheelchair at the bus stop was too remote to be the proximate causation of the plaintiff's injuries. *Id* at 706. The court also found that a five-to-ten minute wait for a wheelchair was not a violation of the ACAA. *Id* at 701. In *Glatfelter v. Delta Airlines, Inc,* a passenger who had requested wheelchair assistance arrived at his connecting airport to find no wheelchair waiting. 253 Ga.App. 251, 252–253, 558 S.E.2d 793 (Ga.Ct.App.2002). A gate agent called for assistance, but after 15–20 minutes passed without the appearance of a wheelchair the passenger and his wife decided to walk to their connecting flight. *Id* at 253, 558 S.E.2d 793. The passenger then fell and hurt himself on an escalator. *Id.* In finding for the defendant, the Georgia Court of Appeals concluded that "a minimal delay in providing the requested assistance does not constitute a violation of the [ACAA]." *Id.* Highlighting the fact that there was no evidence that the agent had refused plaintiff's request for a wheelchair, the court went on to find that, although a delay in providing a wheelchair could amount to a failure to provide assistance, "as a matter of law [ ] under these circumstances a delay of 15–to–20 minutes did not constitute a violation of the ACAA." *Id.*

**\*8** Using *Adiutori* and *Glatfelter* as guidance, the court finds that, as a matter of law, NWA did not breach any duty of care owed to plaintiff. The facts of this case are that plaintiff waited a very short time after the gate agent told her she would try to find a wheelchair. Indeed, no more than twelve minutes elapsed after her flight arrived at the gate at 5:58 AM and her decision to set out to her connecting gate on her own 6:10 AM. Moreover, a mere seven minutes passed from plaintiff's scheduled arrival time at 6:03 AM—before which a prescheduled wheelchair operator could not have reasonably been expected to appear—and her 6:10 AM decision to walk unassisted.

Before leaving the arrival gate on her own to find her connecting flight, plaintiff did not inquire any further with the gate agent about the wheelchair or about another electric passenger gate. And nowhere in the record is there evidence that plaintiff was told that NWA would not be able to get her a wheelchair that morning. While an extended delay in bringing a wheelchair may amount to a failure to provide assistance, the short delay here—of no more than twelve minutes, if that long and no doubt still less—does not. Plaintiff does not distinguish *Adiutori* or *Glatfelter* in her opposition, nor does she provide any countervailing authority suggesting that her short wait constituted a failure to provide assistance and therefore a breach of duty.

b

Even assuming, for the sake of argument, that plaintiff could establish that NWA breached the duty of care, to succeed on her negligence claim plaintiff must prove that NWA's failure to provide a wheelchair was the direct and proximate cause of her injuries. See *Marsiglia v. Dozier,* 161 Cal. 403, 405, 119 P. 505 (1911). As one California court has explained:

> To impose liability it is not enough to show that an injury would not have occurred in the absence of the negligent act, but it must be shown that the act was the efficient cause of the injury-the act from which the injury followed in continuous sequence unbroken by any efficient intervening cause. Thus even though one has been guilty of negligence, he may still not be liable * * * if such negligence is remote in the chain of causation and did not contribute proximately to the injury. And in this connection it is held

generally that the word 'proximate' is intended to mean direct or immediate, as opposed to remote; and that negligence requiring the interposition of new and independent agencies to cause injury is remote.

*Girard v. Monrovia City School Dist.,* 121 Cal.App.2d 737, 742, 264 P.2d 115 (2nd Dist 1953) (citations and quotations omitted).

NWA argues that plaintiff's theory of causation is too remote to support a claim of negligence. Doc # 61 at 17–20. In opposition, plaintiff cites a string of cases in support of her contention that the causation inquiry is better left with a jury. Doc # 73 at 12–16. Plaintiff's submission, however, does not address NWA's arguments in support of its motion or distinguish the myriad cases defendant provides; rather, it seeks to frame the causation issue around what was "Plaintiff's state of mind at the time [of her fall]." *Id* at 16, 264 P.2d 115. In doing so, plaintiff seeks to frame the issue before the court as a determination whether plaintiff was "operating under the lash of the emotional exigencies she was suffering because of [NWA's] breaches." *Id.*

**\*9** Despite plaintiff's contentions, there could be no reasonable basis upon which a jury could find a causal link between defendant's conduct and plaintiff's injury. Assuming for a moment that NWA failed to provide a wheelchair immediately upon plaintiff's disembarkment, plaintiff was injured only after she waited for no more than twelve minutes before making the decisions (i) not to wait for the wheelchair; (ii) to walk, unassisted; and (iii) to use a moving walkway, a device she was unfamiliar with. In brief, these decisions, made solely by plaintiff, broke the chain of causation as a matter of law.

Whatever reason plaintiff may have had, she made the choice, on her own, to attempt to walk to her connecting gate at 6:10 AM. Furthermore, she made the decision to use a heavily-trafficked moving walkway—a device with which she was unfamiliar. These decisions, made no more than twelve minutes after her flight arrived at the gate, are intervening facts that break the causal chain between defendant's conduct and plaintiff's injury. No reasonable juror could conclude, therefore, that plaintiff's subsequent fall was the direct or proximate result of NWA's conduct.

### C

Because the court finds that (i) the failure to provide a wheelchair within the time plaintiff waited at the gate was not a breach of NWA's duty, and (ii) no reasonable juror could conclude that NWA's conduct was the direct or proximate cause of plaintiff's fall, defendant's motion for summary judgment, Doc # 61, is GRANTED.

### III

As explained above, plaintiff's claims fail as a matter of law. Plaintiff's state-law claims are preempted by the federal regulations promulgated under the ACAA. And, while plaintiff argues in her opposition that NWA owed her a duty under the ACAA, she has no private right of action in district court under the act. Moreover, she has failed to show, after NWA satisfied its initial burden under FRCP 56(c), any genuine issue of material fact as to breach of duty. Plaintiff failed to wait at the arrival gate when a wheelchair was not made immediately available. The fact that NWA was unable to provide plaintiff with a wheelchair in the few minutes that she waited at the arrival gate is not, as a matter of law, a breach of a duty of care. Furthermore, plaintiff's decisions to set out on her own, unassisted, and to use, while distracted, a busy moving walkway with which she was unfamiliar, break the causal chain.

For the above reasons, NWA's and Globe's motions for summary judgment, Docs # 68; # 61, are GRANTED. The clerk is DIRECTED to enter judgment in favor of defendants Globe and NWA, to terminate all motions and to close the file.

IT IS SO ORDERED.


**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5564629


Footnotes

1    Plaintiff neither cites 14 CFR section 382.39 specifically, nor provides any analysis of that regulation. Instead, she cut-and-pastes an

except from ⚑ *Hill v. Skywest Airlines,* 2008 WL 4816451 (E.D.Cal.), highlighting a portion Section 382.39 that is quoted in that
case. The court interprets this as an argument that NWA owed plaintiff a duty to provide wheelchair access in the terminal under the
federal regulations. The court notes that, as of May 13, 2009, the relevant portions of Title 14 of the Code of Federal Regulations were
amended. The proper citation is to 14 CFR section 382.91, which addresses what assistance a carrier must provide to a passenger
with a disability within the terminal. Also, 14 CFR section 382.95 addresses an air carrier's obligations with respect to deplaning.

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    9

📒 KeyCite Yellow Flag - Negative Treatment
Distinguished by Dolan v. JetBlue Airways Corporation, S.D.Fla., May 28, 2019

2012 WL 1155138
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Susan MILLER, on Behalf of Herself and All Others Similarly Situated, Plaintiff,

v.

DELTA AIR LINES, INC., Defendant.

No. 4:11–CV–10099–JLK.
|
April 5, 2012.

**Attorneys and Law Firms**

Peter Prieto, Matthew Weinshall, John Gravante, III, Aaron Samuel Podhurst, Podhurst Orseck Josefsberg et al, Miami, FL, Alan M. Mansfield, The Consumer Law Group, San Diego, CA, David Kalman Tucker, David K. Tucker, P.A., Coral Gables, FL, for Plaintiff.

William Barry Blum, Brett M. Halsey, Genovese Joblove & Battista, P.A., Miami, FL, for Defendant.

### *FINAL ORDER OF DISMISSAL WITH PREJUDICE*

JAMES LAWRENCE KING, District Judge.

**\*1** THIS CAUSE comes before the Court on Defendant Delta Air Lines, Inc.'s ("Delta") Motion to Dismiss Complaint [DE # 18], filed January 27, 2012. The Court is fully briefed on the matter and proceeds with the benefit of oral argument.[1] For the reasons explained more fully below, Defendant's Motion is granted and the case is dismissed accordingly.

## I. BACKGROUND

Plaintiff Susan Miller initiated this action against Delta on December 2, 2011 for damages and declaratory relief resulting from her baggage being delayed on a Delta flight from Miami to Las Vegas on November 15, 2010. Compl. [DE # 1], at ¶ 7. Plaintiff's Complaint alleges Delta has a contract with all its passengers to reimburse them up to $3,300 for expenses if their bags are delayed. *Id.* at ¶ 2.[2] Plaintiff alleges she paid "over $315.00 for replacement toiletries, medication, and other items in her suitcase, as well as transportation to and from the airport in an attempt to locate them." *Id.* at ¶ 7. Plaintiff further alleges she advised a Delta representative in Las Vegas that her baggage was delayed, but was told that "nothing could be done to assist her." *Id.* Finally, on December 5, 2010, Plaintiff alleges she made a claim with Delta that was "rejected and/or ignored." *Id.*

Based on these facts, Plaintiff seeks declaratory relief, damages, attorneys' fees, and class action damages in three counts: Count I for Breach of Contract, Count II for Assumpsit, Unjust Enrichment and Declaratory Relief, and Count III for Violation of State Consumer Protection Laws, including the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201. *et. seq.*

On January 27, 2012, Delta filed a Motion to Dismiss all three counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and S.D. Fla. L.R. 7.1 of this Court. [DE # 18]. The Court heard oral argument on the motions on March 12, 2012. [*See* DE # 30].

## II. DISCUSSION

When evaluating a Rule 12(b)(6) motion to dismiss, the Court must view the allegations in the complaint in the light most favorable to Plaintiff. *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283 (11th Cir.2010). To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 1289 (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (U.S.2007)).

Defendant Delta seeks dismissal of Plaintiff's claims under Rule 12(b)(6) for failure to plead sufficient facts to bring each of the three counts into the realm of plausibility. Defendant also contests Plaintiff's standing to represent putative class members. Since the Court is persuaded that Plaintiff's claims are preempted by the federal Airline Deregulation Act ("ADA"), 49 U.S.C. § 40101 *et seq.,* and barred under the one-year statute of limitations contained in the Contract of Carriage, it need not reach the sufficiency of Plaintiff's factual allegations nor Plaintiff's request for class certification.

### A. ADA Preemption

**\*2** With respect to Counts I–III, Defendant argues Plaintiff's claims are preempted by the ADA because they impermissibly attempt to regulate the "services" of an airline, specifically, the way Delta handles checked baggage and passenger claims related to checked baggage. The Court agrees.

The ADA's preemption clause reads in relevant part: [N]o State ... shall "enact or enforce a law, rule, regulation, standard, or other provision having the force and effect of law relating to price, route, or *service* of an air carrier ...." 49 U.S.C. § 41713(b)(1) (emphasis added). The Eleventh Circuit has instructed the clause "is properly afforded an extremely broad scope," *Branche v. Airtran Airways, Inc.,* 342 F.3d 1248, 1257 (11th Cir.2003), and has specifically held that "baggage handling" is part of an airline's "services" for purposes of ADA preemption. *Koutsouradis v. Delta Air Lines, Inc.,* 427 F.3d 1339, 1343, 1344 (11th Cir.2005). *See also Morales v. Trans. World Airlines, Inc.,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (2008 holding ADA's preemption clause was "deliberately expansive" and of "broad scope"); *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (holding Illinois Consumer Fraud Act could not be applied to regulate changes to the America Airlines frequent flyer program). [3]

In *Hodges v. Delta Air Lines, Inc.,* the Fifth Circuit reasoned that because the term ' "services' generally represent[s] a bargained-for or anticipated provision of labor from one party to another," the term, as used in the ADA, includes "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself." 44 F.3d 334, 336 (5th Cir.1995) (*en banc* ). The Eleventh Circuit adopted this definition in *Branche, supra* at 125657. This Court will follow *Hodges* and the majority of circuit precedent in adopting a broad definition of "service" as it is used in the ADA preemption clause.

Plaintiff maintains that her claims have little to do with "services" provided by Delta after ticket purchase, and instead arise from Delta's failure to inform customers of their right to reimbursement of up to $3,300 for lost, damaged or delayed baggage. *See* Compl. [DE # 1], at Intro., ¶¶ 2, 3, 13, 19. Specifically, Plaintiff suggests that Delta misleads passengers into believing that they are entitled only to $25 to $50 per day in reimbursed expenses. *Id.* at Intro., ¶¶ 2, 14, 19. Plaintiff does not allege that she was ever told of such a per day limit. Instead, Plaintiff alleges Delta should post clearer and more prominent signs explaining a passenger's right to up to $3,300 in reimbursement for expenses incurred due to lost, damaged or delayed luggage. *Id.* at ¶ 3. Plaintiff acknowledges that the alleged right to reimbursement is contained in the Contract of Carriage, which is pursuant to a Department of Transportation regulation, 14 CFR Part 254, and is on posted signs at airports. *Id.* at ¶¶ 2, 3, 13 & Ex. 1.

**\*3** Based on these factual allegations, Plaintiff argues her claims survive under the *Wolens* exception for "court enforcement of contract terms set by the parties themselves." 513 U.S. at 222. The Court does not find this argument persuasive. The *Wolens* court itself explained that the limited exception only applies where "an airline itself dishonored a term the airline itself stipulated." *Id.* at 232–33. Here, Plaintiff seeks to pursue claims that go far beyond the obligations stipulated to by Delta in the Contract of Carriage. The Contract of Carriage does not, for example, impose upon Delta any undertaking as to the type or size of signage that must be posted in airports or what information will be provided to a passenger whose baggage in delayed.

Plaintiff's claims clearly rest on allegations that "relate to the heart of services that an airline provides." *Koutsouradis,* 427 F.3d at 1344 n. 2. Permitting this claim to move forward as plead would thus impermissibly sanction regulation of the manner in which the airline advertise their reimbursement services and would interfere with the provision of baggage handling services to their passengers, thereby offending the stated purpose of the Deregulation Act.

Accordingly, Counts I, II and III of Plaintiff's claim are preempted.

#### B. One-year Limitation of Action in the Contract of Carriage

In addition to being preempted, Defendant argues Plaintiff's claims are untimely and should be dismissed because this action was not filed within one year from the occurrence as required in the Contract of Carriage.

It is well settled that "when a written contract requires notice as a condition precedent to maintaining suit, that condition must be met absent a valid excuse." *S. Broad. Group, LLC v. Gem Broad., Inc.,* 145 F.Supp.2d 1316, 1325 (M.D.Fla.2001) (citing *Eglin Village v. Barnett Nat'l Bank,* 86 So.2d 271, 272 (Fla.1956)). *See also Lenbro Holding, Inc. v. Folic,* 2011 WL 4706194, at \*12 (S.D.Fla. Oct.4, 2011) (dismissing a breach of contract claim based in part on "insufficient factual allegations to refute" a statute of limitations defense). The Contract of Carriage applicable to Plaintiff's claims here provides in pertinent part:

> No action shall be maintained for any loss of, or damage to, or any delay in the delivery of baggage arising out of or in connection with transportation of, or failure to transport any passenger or baggage unless notice of a claim is presented to an office of Delta within 24 hours after the alleged occurrence of the events giving rise to the claim, and unless the action is *commenced within one year after such alleged occurrence.*

Contract of Carriage [DE # 18–1], at Rule 190(I)(7) (emphasis added).

As alleged, Plaintiff flew and her baggage was delayed on November 15, 2010. Compl. [DE # 1], at ¶ 7. Plaintiff filed the instant lawsuit on December 2, 2011—more than one year after the alleged occurrence. Plaintiff attempts to avoid the one-year contractual limitation by arguing that the five-year statute of limitation under Florida law applies. *See* Resp. [DE # 27], at 7. This argument is without merit.

**\*4** The time for filing suit under Delta's Contract of Carriage is specifically authorized by law and DOT regulations. 14 C.F.R. § 253 .5(b)(2) (2009). The case law is clear that Section 95.03 of the Florida Statutes does *not* apply to extend statutes of limitation set forth in federally regulated contracts or transactions. *See Life Sciences, Inc. v. Emery Air Freight Corp.,* 341 So.2d 272, 272–73 (Fla. 2d DCA 1977). [4] *See also, e.g., Arrow Beef Corp. v. S. Atl. & Caribbean Lines, Inc.,* 280 So.2d 43, 44 (Fla. 3d DCA 1973) (finding a one-year limitation of action in bill of lading subject to COGSA enforceable "notwithstanding the provisions of § 95.03, Fla. Stat"); *J.B. Effenson Co. v. Three Bays Corp.,* 238 F.2d 611, 616 (5th Cir.1956) (holding a one-year limitation valid in contract incorporating COGSA despite § 95.03, Fla. Stat.). Plaintiff cannot use Florida law to expand Delta's

undertaking in the Contract of Carriage by exposing it to claims made within five years, rather than the one-year expressly provided in the Contract of Carriage.

## III. CONCLUSION

Accordingly, after a careful review of the record, consideration of the argument of counsel, and being otherwise fully advised, it is

**ORDERED, ADJUDGED** and **DECREED** that:

1) Defendant's Motion to Dismiss [DE # 18] be, and the same, is hereby6 **GRANTED** and the case is dismissed accordingly.

2) All pending motions not otherwise ruled upon are **DENIED AS MOOT.**

3) This case is **CLOSED.**

**DONE and ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2012 WL 1155138

Footnotes

1    Plaintiff filed an Opposition to the Motion to Dismiss on March 5, 2102 [DE # 27] and Defendant replied on March 9, 2012 [DE # 29]. The Court heard oral argument on the Motion on March 12, 2012.

2    The Contract of Carriage is set forth in each passenger's ticket. A copy of the "Conditions of Carriage" applicable to Plaintiff's flight on November 15, 2010 is attached as Exhibit 1 to the Motion to Dismiss [DE # 18] and is incorporated by reference into Plaintiffs Complaint. *See* 🟡 *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir.2005) ( "[T]he court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiffs claim and (2) undisputed.").

3    In *Wolens,* the Court carved out a narrow exception for the enforcement of "routine" contract claims based on the airline's "self-imposed undertakings." 🟡 513 U.S. at 232–33. Although the Supreme Court concluded that the ICFA was preempted by the ADA because it was "a means to guide and police the marketing practices of airlines," it also held that the Deregulation Act was *not* intended to preempt contract claims, which "seek [ ] recovery solely for the airline's alleged breach of *its own, self-imposed undertakings." Id.* at 22728 (emphasis added).

4    In *Life Sciences,* the Florida court of appeal rejected the precise argument Plaintiff makes here and held that Fla. Stat. § 95.03 did not invalidate a one-year statute of limitation in an air freight contract of carriage subject to the Federal Aviation Act of 1958, the precursor of the ADA. The carrier's tariff, incorporated in the contract of carriage, provided that the carrier would not be liable in any action "unless such action is brought within one (1) year" after the carrier denied a party's damage claim. The action in *Life Sciences* was filed more than a year after the carrier denied the claim, but within the Florida statute of limitations for breach of contract claims. The court of appeal held that the claim was barred by the one-year limitation in the contract of carriage and specifically stated that "the provisions of Section 95.03, Florida Statutes (1971), which prohibit the contractual shortening of statutory limitation periods, have no effect upon [the contract of carriage] because the regulation of shipments of goods in interstate commerce has been preempted by federal authority." *Id .* at 272–73.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                                        4

2010 WL 11651978
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan, Southern Division.

Ann Pierce NJOKU, Plaintiff,

v.

NORTHWEST AIRLINES, INC., Defendant.

CIVIL ACTION NO. 09-13403
|
Signed 09/22/2010

**Attorneys and Law Firms**

Eric I. Frankie, Law Office of Eric I. Frankie, Royal Oak, MI, for Plaintiff.

James K. Thome, Thomas M. Peters, Vandeveer Garzia, Troy, MI, for Defendant.

### ORDER DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT (DOCKET NO. 16)

MONA K. MAJZOUB, UNITED STATES MAGISTRATE JUDGE

 **\*1** This matter comes before the Court on Plaintiff's Motion to Amend Complaint filed on July 5, 2010. (Docket no. 16). The motion is fully briefed. This action has been referred to the undersigned for decision on all pretrial matters. (Docket no. 6). The Court dispenses with oral argument on this motion. E.D. Mich. LR 7.1(f). The motion is now ready for ruling.

Plaintiff moves to amend her Complaint to add a claim under the Air Carrier Access Act of 1986, 49 U.S.C. § 41075 ("ACAA"), which prohibits air carriers from discriminating against disabled individuals. (Docket no. 16). Defendant opposes Plaintiff's Motion to Amend on the grounds that the proposed amendment is futile and was filed after the close of discovery. (Docket no. 17).

Rule 15(a) of the Federal Rules of Civil Procedure provides that a "party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(A),(B). Leave to amend is to be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). The decision whether to permit amendment is committed to the discretion of the trial court. *Hayden v. Ford Motor Co.*, 497 F.2d 1292, 1294 (6th Cir. 1974).

In deciding whether to grant a motion for leave to amend, the trial court may consider such factors as delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failures to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of the amendment. *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citation omitted).

In *Thomas v. Northwest Airlines Corp.*, No. 08-11580, 2008 WL 4104505 (E.D. Mich. Sept. 2, 2008), the court considered whether a passenger had an implied right to sue Northwest Airlines for a violation of the ACAA. After a thorough analysis, the

court concluded that there is no private right of action under the ACAA and dismissed plaintiff's claim. *Id.* at *5. In *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263 (10th Cir. 2004) and *Love v. Delta Air Lines*, 310 F.3d 1347 (11th Cir. 2002), the Tenth and Eleventh Circuits reached similar conclusions, finding that there is no implied private right of action in federal court under the ACAA. Indeed, the decisions in *Thomas*, *Love*, and *Boswell* are consistent with the majority of cases that have considered this issue following the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which concluded that courts may not create an implied private cause of action to enforce federal law if the text and structure of the statute do not reveal a congressional intent to do so. *See Lopez v. JetBlue Airways*, No. 10-CV-1552, 2010 WL 3311428 (E.D. N.Y. Aug. 19, 2010) (finding no private right of action under the ACAA); *Jackson v. United Airlines, Inc.*, No. 08-CV-182, 2009 WL 1036068 (E.D. Va. April 17, 2009) (same); *Wright ex rel. D.W. v. Am. Airlines, Inc.*, 249 F.R.D. 572 (E.D. Mo. 2008) (same); *Brown v. Delta Air Lines, Inc.*, No. CIV-03-871, CIV-03-901, CIV-03-943, 2004 WL 5041257 (W.D. Okla. Oct. 8, 2004) (same).

**\*2** The Court is persuaded that there is no private cause of action under the ACAA. Hence, Plaintiff's proposed amendment is futile and her motion will be denied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Amend Complaint is **DENIED.**

### NOTICE TO THE PARTIES

Pursuant to Fed. R. Civ. P. 72(a), the parties have a period of fourteen days from the date of this Order within which to file any written appeal to the District Judge as may be permissible under 28 U.S.C. § 636(b)(1).

**All Citations**

Slip Copy, 2010 WL 11651978

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 877684
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

PHOENIX LIFE INSURANCE COMPANY, a New York corporation, and
PHL Variable Insurance Company, a New York corporation, Plaintiffs,

v.

LaSALLE BANK N.A., LaSalle Bank Corporation, Frank J. Ellias as Trustee of the Rosen Family
Irrevocable Trust dated September 12, 2005, Robert Rosen, Coventry Capital 1 LLC, Wilmington Trust
Company, CBI Financial LLC, Raider–Dennis Agency, Inc., and Larry S. Campagna, Defendants.

Nos. 2:07–cv–15324, 2:08–cv–11562.
|
March 30, 2009.

West KeySummary

1   **Conspiracy** 🔑 Conspiracy to Defraud

An insurer's allegation than an insured and a beneficiary made specific representations in their applications for a life insurance policy which were false at the time they were made was sufficient to state a claim for civil conspiracy. The insurer further alleged that the insured and beneficiary knew about the misrepresentations, participated in, encouraged or aided and abetted those misrepresentations, that the policies would not have been issued had the misrepresentations not been made, and that the insured and beneficiary benefited from the misrepresentations by splitting among themselves several hundred thousand dollars in commissions, paid by the insurer as a result of the issued policy.

**Attorneys and Law Firms**

James E. Brenner, Matthew R. Rechtien, Clark Hill, Detroit, MI, for Plaintiffs.

Jonathan B. Frank, Jackier, Gould, Joseph H. Hickey, Dykema Gossett, George A. Googasian, Googasian Law Firm, Bloomfield Hills, MI, Christine R. Essique, Ellias & Elias, W. Bloomfield, MI, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
### MOTION TO DISMISS (D/Es 17D/Es 17, 20 20 in 08–cv–11562)

STEPHEN J. MURPHY, III, District Judge.

**\*1** This is a claim by an insurance company for a declaratory judgment of rescission against its insured, and a common law tort claim of civil conspiracy to commit fraud against its insured, the alleged transferees of two life insurance policies and certain persons and entities that allegedly conspired in the insured's allegedly fraudulent statements. Before the Court is defendants'

motion to dismiss all claims. For the reasons stated below, the Court grants in part and denies in part defendants' motion to dismiss.

## FACTS

Plaintiffs Phoenix Life Insurance Company ("Phoenix") and PHL Variable Insurance Company ("PHL") are New York corporations with their principal places of business in Connecticut. First Amended Complaint in Case No. 08–11562 (hereinafter "Complaint") ¶¶ 1–2. Defendant LaSalle Bank N.A. ("LaSalle N.A.") is an Illinois corporation with its principal place of business in Illinois, and defendant LaSalle Bank Corporation ("LaSalle Corporation") is a Delaware corporation with its principal place of business in Illinois. Complaint ¶¶ 3–4. Defendant Robert Rosen is a citizen of Michigan. Complaint ¶ 6. The Rosen Family Irrevocable Trust ("Rosen Trust") is a trust established under the laws of Michigan. Defendant Frank J. Ellias is Trustee. Complaint ¶ 5. Defendants Coventry Capital 1 LLC ("Coventry Capital") and CBI Financial LLC ("CBI") (collectively "Coventry") are Delaware corporations with their principal places of business in Delaware. Complaint ¶¶ 7, 9. Defendant Wilmington Trust Company has been voluntarily dismissed from the case.

This suit arises from two Phoenix life insurance policies issued by Phoenix to Rosen and the Rosen Trust. On March 27, 2006, Robert Rosen applied for the first of the two policies for $5,000,000 in universal life insurance coverage from Phoenix, with himself as insured and owner, and the Rosen Trust as beneficiary. Complaint ¶ 15. The application, which was signed by Rosen, contains a clause that all statements by the applicant are "full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded." *Id.* Rosen also executed a "Statement of Client Intent," dated the same date as the application, that contained certain questions to be answered by the client. Complaint ¶ 16. Question 1 asks whether "non-recourse premium financing or any other method [is] being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being applied for?" *Id.* Question 2 asks whether there is an intent to finance any of the premiums. *Id.* Question 3 asks whether the current intent is to sell the policy in the future. *Id.* Question 4 asks whether there has been any inducement to enter into this transaction. *Id.* All of these questions were answered "No." *Id.* Question 5, which asks whether the purchase of the insurance or any element of the financing allows "for an open, free and competitive settlement of the contract with any firm" is answered "Yes." *Id.* The reason for purchasing the policy is stated to be estate planning. *Id.* The Statement of Client Intent is also signed by Rosen. *Id.*

*2 On March 30, 2006, Phoenix received a replacement application, changing the owner of the policy from Rosen to the Rosen Trust. Complaint ¶ 17. The replacement application also represents that the statements within are full, complete and true to the best of the applicants knowledge and belief and is dated March 27, 2006 and signed by Rosen and by the Trustee. *Id.*

Pursuant to March 27, 2006 application, Phoenix issued Policy No. 97516049 in the amount of $5,000,000 with an effective date of April 18, 2006 (the "First Rosen Policy"). On May 5, 2006, Rosen, as insured, signed a Policy Acceptance Form that contained a declaration that the "insured ... declares that the statements made in the application remain full, complete and true as of this date." Complaint ¶ 20.

On May 12, 2006, the Rosen Trust signed an Assignment of Life Insurance Policy as Collateral (the "First Assignment"), assigning the policy to LaSalle N.A. Complaint ¶ 21 The First Assignment indicated that the Rosen Trust has borrowed $342,148.68 from LaSalle. *Id.* Under the Assignment, LaSalle N.A. is the primary beneficiary of the policy to the extent of the principle amount of the loans made to the Rosen Trust plus accrued interest and other liabilities and has the right to assign the policy. *Id.* Default by the Rosen Trust allows LaSalle N.A. to foreclose upon and assign the policy. *Id.* Phoenix received the First Assignment two weeks later. Complaint ¶ 21–22.

On July 24, 2006, Rosen and the Trustee filed a second application with Phoenix for another $5,000,00 in universal life insurance coverage. Complaint ¶ 23. The second application contained the same representations as did the application for policy number 97516049. *Id.* The July 24, 2006 application additionally asked whether "non-recourse premium financing or any other method

[is] being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being applied for" and whether there is "an intention that any party, other than the Owner, will obtain any right, title or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application?" *Id.* Both questions were answered "No." *Id.* In conjunction with the July 24, 2006 application, Rosen and the Trustee also signed a Statement of Client Intent, which contained the same language as that in the statement relative to policy No. 97516049 and contained the same responses. Complaint ¶ 24. Pursuant to the July 24, 2006 application, Phoenix issued Policy No. 97528338 in the amount of $5,000,000 (the "Second Rosen Policy") with an effective date of September 26, 2006. Complaint ¶ 25. Rosen and the Trustee again signed a "Policy Acceptance Form" dated October 4, 2006, which declared that "statements made in the application remain full, complete, and true as of this date." Complaint ¶ 26.

**\*3** On or about October 10, 2006, Phoenix received an Assignment of Life Insurance Policy as Collateral executed by the Trustee in favor of LaSalle N.A. Complaint ¶ 28. Around November 15, 2006 LaSalle N.A. sent a change of ownership and beneficiary forms to Phoenix. Complaint ¶ 29. The forms had been executed by the Trustee in favor of LaSalle N.A. and bear the dates of November 14 and 15, 2006, and refer to LaSalle N.A. as "Policy Intermediary." *Id.*

On February 2, 2007, Phoenix sent letters to the Trustee and Rosen, expressing concern about these transactions and asking for an explanation. Complaint ¶ 30. The letters stated that Phoenix would not have issued the policies had it been informed that the policies were being obtained as part of a financing or investor ownership transaction and that the assignment of one policy and the transfer of ownership of the other was inconsistent with the statements made in the statement of client intent form. *Id.* The Trust replied that the intent was to provide for liquidity at Rosen's death and all statements were true. *Id.*

On August 7, 2007, Phoenix sent a letter to LaSalle N.A. and the Trustee rescinding and voiding both policies and refunding to LaSalle N.A. the premiums paid for the policies. Complaint ¶ 33. The letter states that Phoenix had investigated the assignments and concluded that both policies were part of a financing and transfer of ownership transaction that was not disclosed to Phoenix despite specific questions. *Id.* The letter goes on to state that Phoenix would not have issued either policy had it been informed of the nature of the financing and third party ownership transaction. *Id.* Finally, the letter states that if LaSalle or the Trustee disagree with Phoenix's decision they should advise Phoenix in writing. *Id.* Neither LaSalle, Rosen nor the Trustee have responded to Phoenix's August 7, 2007 letter, and the refund checks remain uncashed. Complaint ¶ 34.

The complaint asserts based on information and belief that at the time the policies were issued, Rosen and the Rosen Trust intended to transfer ownership of and/or a beneficial interest in the policies to a person or entity that did not have an insurable interest in the life of the insured. Complaint ¶ 35. It also asserts based on information and belief that Rosen, the Rosen Trust, LaSalle N.A. and LaSalle Corporation "communicated and reached understandings among themselves to establish a set of transactions meant to evade legal requirements through technicalities." Complaint ¶ 36. The complaint goes on to assert that Phoenix has since learned that Coventry, Wilmington, CBI, Raider–Dennis and Campagna participated in the communications and understandings with the other defendants and participated in or encouraged or aided and abetted the misrepresentations and concealments of Rosen and the Trustee. Complaint ¶ 38. Phoenix and PHL had filed an earlier separate action against Campagna and Raider–Dennis, Inc., the insurance brokers that sold the policies to Rosen and the Rosen Trust. That case, *Phoenix Life Ins. Co. et al. v. Raider–Dennis Agency, Inc., et al.,* No. 07–cv–15324, was subsequently consolidated with this one and is still pending.

**\*4** The complaint asserts three claims against defendants. The first count of the complaint seeks a declaratory judgment that the policies are null, void and rescinded ab initio. The second count seeks a declaratory judgment that the policies are rescinded because no insurable interest arose in the transferees. The third count is a claim of civil conspiracy to defraud against all defendants.

Defendants Frank J. Ellias and Robert Rosen have filed a counterclaim against Phoenix. In their counterclaim, Ellias and Rosen allege that Phoenix wrongfully rescinded the policies, that the rescission caused Rosen and the Rosen Trust to default, requiring the Rosen Trust to relinquish all of its right, title and interest in the first policy to LaSalle N.A. under the Note and Security

Agreement, and that they anticipate losing their interest in the second policy when the policy matures. Based on these facts, they have counterclaimed against Phoenix for breach of contract. [1]

Defendants Coventry and CBI have filed the instant motion to dismiss the complaint. The motion has been separately joined by defendants LaSalle Bank, NA, LaSalle Bank Corporation, Raider Dennis Agency, Inc., Larry S. Campagna, Frank J. Ellias and Robert Rosen.

## JURISDICTION

Jurisdiction is based on diversity of citizenship. Plaintiffs are New York corporations, having their principal places of business in Connecticut; defendants are citizens of Illinois, Delaware and Michigan. The amount in controversy is alleged to be in excess of $75,000.

## STANDARD OF REVIEW

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, ——, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007) (citations omitted). Accordingly, Federal Rule of Civil Procedure 12(b)(6) allows a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. *See Minger v. Green,* 239 F.3d 793, 797 (6th Cir.2001) (citations omitted).

In assessing a motion brought pursuant to Rule 12(b)(6), the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). To determine whether Plaintiff has stated a claim, the Court will examine the complaint and any written instruments that are attached as exhibits to the pleading. Fed.R.Civ.P. 12(b)(6) & 10(c). Although the pleading standard is liberal, bald assertions and conclusions of law will not enable a complaint to survive a motion pursuant to Rule 12(b) (6). *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not presume the truthfulness of any legal conclusion, opinion, or deduction, even if it is couched as a factual allegation. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

**\*5** This standard requires the claimant only to put forth "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the requisite elements of the claim]." *Bell Atlantic,* 127 S.Ct. at 1965. Thus, although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.' " *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir. Sept.25, 2007) (*quoting Bell Atlantic,* 127 S.Ct. at 1965). Therefore, the Court will grant a motion for dismissal pursuant to Rule 12(b)(6) only in cases where there are simply not "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic,* 127 S.Ct. at 1974.

## ANALYSIS

Coventry moves to dismiss the complaint on four grounds. First, Coventry asserts that Phoenix has impermissibly split its claims by bringing two separate actions based on the same series of events. Second, Coventry argues that the claims for declaratory relief are not appropriate as to Coventry and CBI. Third, Coventry argues that plaintiff's allegations do not constitute grounds

for rescission under Michigan law. Fourth, Coventry argues that Phoenix's conspiracy claims should be dismissed because they fail to sufficiently allege an actionable civil conspiracy. The Court will address each of these arguments in turn.

The first two arguments are easily dealt with. First, the claim splitting argument asserted by defendants in their briefs has been mooted by the consolidation of this suit with the earlier suit by plaintiffs against Raider–Dennis Agency, Inc. and Larry S. Campagna for damages based upon their actions in brokering the insurance policies at issue here. At the oral hearing on this matter counsel for Coventry conceded that this argument is moot. Second, plaintiffs concede Coventry and CBI's second argument, that plaintiffs' claims for declaratory relief should be dismissed because Coventry and CBI did not purchase and do not own the policies at issue and therefore there can be no claim for rescission against them. In their response, plaintiffs state that the complaint does not state a claim for declaratory judgment against Coventry and CBI, but rather only against Rosen, the Rosen Trust and LaSalle. Thus, the Court will grant Coventry's motion in this regard and dismiss any claims for declaratory judgment against Coventry and CBI to the extent any such claims exist.

## I. *Should Phoenix's Claims For Rescission Be Dismissed?*
Despite the fact that plaintiffs concede that there are no claims for declaratory judgment of rescission against Coventry or CBI, Coventry's brief in support of its motion to dismiss goes on to assert substantive arguments as to why those claims should be dismissed as a matter of law against all defendants. At the hearing on its motion, Coventry argued that it is seeking to dismiss the declaratory judgment claims against all the defendants because those claims are the predicate for the conspiracy claims that have been asserted against Coventry and CBI. This seems to be a bit of a logical stretch, but the defendants Rosen, the Rosen Trust and all LaSalle defendants have separately joined in Coventry's motion to dismiss, so the Court will address Coventry's arguments on the declaratory judgment claims.

 **\*6** Coventry argues that Phoenix's declaratory judgment claims in Count I and II of the complaint should be dismissed because, first, the complaint fails to allege grounds for rescission based on fraud or misrepresentation; and, second, that there are no facts alleged which would support rescission based on lack of insurable interest *ab initio.* The Court will examine each of these arguments in turn.

### A. *Should plaintiffs' declaratory judgment claims for rescission of the two Rosen policies on the basis of misrepresentations in the policy applications be dismissed?*
Coventry argues that all claims for rescission based upon alleged misrepresentations in the applications for the two policies should be dismissed because only material misrepresentations contained in the application itself may be used to rescind the policy, and plaintiffs have alleged no misrepresentations in the First Rosen Policy; Coventry further argues that the only two alleged misrepresentation in the application for the Second Rosen Policy are not actionable as a matter of law.

As to the First Rosen Policy, Coventry maintains that plaintiffs' claim for rescission based on misrepresentation fails because the only alleged misrepresentations were contained in the Statement of Customer Intent, which was not part of the application for the First Rosen Policy, and the Customer Acceptance, which was executed after the policy issued. Coventry argues that Michigan law precludes plaintiff from relying on statements that are not contained in the written application or endorsed on or attached to the policy.

Michigan law provides specifically that an insurance company may only seek rescission of an insurance policies on the basis of statements that are contained in the insurance application itself and which are "endorsed upon or attached to the policy when issued." M.C.L. § 500.4016 provides that:

> There shall be a provision that all statements made by the insured, shall, in the absence of fraud, be deemed representations and not warranties, and that no such statement shall avoid the policy unless it

is contained in a written application and a copy of such application shall be endorsed upon or attached to the policy when issued.

Furthermore, section 500.2226 of the Insurance Code provides as follow:

> (2) Every policy of life insurance hereafter issued or delivered within this state by any life insurer doing business within this state shall contain the entire contract between the parties and nothing shall be incorporated therein by reference to any constitution, bylaws, rules, application, or other writing unless the same are endorsed upon or attached to the policy when issued.

Phoenix's claims for rescinding the First Rosen Policy are based solely upon representations made by Rosen or the Trust in documents that were not endorsed upon or attached to the policy when issued. Therefore, under the plain language of M.C.L. §§ 500.2226 and 500.4016, they cannot be grounds for rescission in Michigan. Whether or not they were part of the "application process" is irrelevant: if they are not attached to the policy when issued they cannot form the basis for rescission.

**\*7** Phoenix argues that the complaint still states a claim for rescission of the First Rosen Policy because common law has always permitted the avoidance of contracts, including insurance contracts, procured by fraud, and that the Statement of Client intent is admissible as evidence to establish fraud in the procurement of the policy even though it was not attached to the insurance policy when issued. The Michigan Supreme Court, however, has already rejected Phoenix's argument in *New York Life Ins. Co. v. Hamburger,* 174 Mich. 254, 257–58, 140 N.W. 510 (1913). Furthermore, *Wiedmayer v. Midland Mutual Life Ins. Co.,* 414 Mich. 369, 324 N.W.2d 752 (1982), cited by Phoenix in support of its argument, does not overrule *Hamburger.* The Court in *Wiedmayer* merely concluded the insurer could invoke a statute to void an insurance policy despite the absence of an express contractual right to do so. *Id.* at 374, 324 N.W.2d 752. The court did not conclude that allegations of common law fraud supersede the requirements of section 500.4016. *Id.* at 375–76, 324 N.W.2d 752.

Because Michigan law requires a claim for rescission on the grounds of material misrepresentations to be based solely on representations endorsed on or attached to the policy at issue, the Court will dismiss Phoenix's claims for rescission of the First Rosen Policy to the extent that those claims are based upon the insured's alleged misrepresentations in the application process for the First Rosen Policy. The Court will also dismiss any claims for rescission of the Second Rosen Policy based upon any alleged misrepresentations that were not actually attached to or endorsed upon the policy when issued.

As to the Second Rosen Policy, there are two alleged misrepresentations that were in the application for insurance that was attached to the policy when issued, and therefore could form the basis for dismissal in the proper circumstances. As to these statements, Coventry argues that the asserted misrepresentations are not actionable under Michigan law because they are not material misrepresentations.

Under Michigan law, rescission is only permitted when an insured makes a material misrepresentation in the application for insurance. *Old Life Ins. Co. v. Garcia,* 411 F.3d 605, 611 (6th Cir.2005), *vacated in part,* 418 F.3d 546 (2005) *(citing Lake States Ins. Co. v. Wilson,* 231 Mich.App. 327, 586 N.W.2d 113 (Mich.Ct.App.1998)). A misrepresentation in the insurance context is limited to "a statement as to past or present fact." M.C.L. § 500.2218(2).

The first alleged misrepresentation in the second application contained the question "[i]s there an intention that any party, other than the Owner, will obtain any right, title or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application?" Amended Complaint ¶ 23. To this question, the insured answered "[n]o" and the question and answer are attached to the policy. Coventry argues first, that plaintiffs fail to allege that this is a misrepresentation because they fail to allege

that Rosen or the Rosen Trust intended to convey a right, title or interest in the Second Rosen Policy when they completed the application on July 24, 2006, and instead simply allege that the intent to transfer existed at the time the Second Rosen Policy issued. The Court does not find this argument persuasive. While the complaint alleges in paragraph 35 that Rosen and the Rosen Trust intended to transfer the policies at the time they were issued, it also alleges a claim for rescission based upon material misrepresentations in the application process (Complaint ¶ 41) and alleges that the representations made in the "application process" for the First and Second Rosen Policies were untrue at the time they were made. (Complaint ¶¶ 49–52). In considering a motion to dismiss, the Court is obliged to read the allegations in a complaint in the light most favorable to the nonmoving party, and thus, read in this light, the Court finds the complaint sufficiently alleges that the intent to transfer existed a the time of the application. The question asks whether, at the time of the application, there was a present intention on the part of the insured to transfer any right, title or interest in the policy to a third party. The question does not ask whether the policy *will* be transferred, which would be a question about future intent.

**\*8** Further, Coventry's argument that a collateral assignment is not a "right, title or interest" in the policy is also not persuasive.

A collateral assignment is an interest in the policy, specifically a security interest in the policy proceeds. *See Emmons v. Lake States Ins. Co.,* 193 Mich.App. 460, 464, 484 N.W.2d 712 (1992). The policies themselves provide that the interests of an assignee of the owner, including a collateral assignee, takes precedence over the interest of any beneficiary not irrevocably named or any contingent owner. First Rosen Policy § 18, attached as Exhibit A to Motion for Summary Judgment; Second Rosen Policy § 18, attached as Exhibit B to Motion for Summary Judgment. Since a collateral assignee has rights under the terms of the policies at issue, the argument that the collateral assignee has no "interest" in the policies is not persuasive. Further, the question in the application asks about any "right, title or interest" and is not by its terms limited to ownership interest as contended by defendants. In fact, if the question were limited to ownership interests, the question would have only asked about title, since such a construction makes the words "right" and "interest" redundant. Finally, Rosen and the Trust have counterclaimed asserting that the plaintiff's actions have caused LaSalle to foreclose on the First Rosen Policy and, as a result, LaSalle now owns the policies. This strongly suggests that at least LaSalle and the Trust believe that LaSalle received an enforceable interest in the policies. While defendants are correct that ambiguities are construed in favor of the insured, the construction they urge would read ambiguity into a question where no ambiguity exists. The insured and the Rosen Trust answered "no" to the question at issue, and a question of fact therefore exists as to whether the statement was a misrepresentation. Therefore, the Court will deny defendants' motion to dismiss plaintiffs' claim on this basis.

The second alleged misrepresentation in the application for the Second Rosen Policy is that Rosen and the Rosen Trust answered "[n]o" to the question "[i]s non-recourse premium financing or any other method being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being applied for?" Complaint ¶ 23. Coventry argues that "on its face, this question can only be answered in the negative" because the Second Rosen Policy did not issue until September 26, 2006, more than two months after the application was submitted. In light of this fact, Coventry argues that it is not plausible to contend that premiums were "being paid" at the time of the application more than two months earlier.

The interpretation of an insurance policy is a question of law for the Court. *Morley v. Automobile Club,* 458 Mich. 459, 465, 581 N.W.2d 237 (1998). The terms of a clear and unambiguous provision are not open to construction and must be applied as written. *Michigan Mutual Ins. Co. v. Dowell,* 204 Mich.App. 81, 87, 514 N.W.2d 185 (1994) (citing *Clevenger v. Allstate Ins. Co.,* 443 Mich. 646, 654, 505 N.W.2d 553 (1993)). Ambiguous provisions, however, are "open to construction and questions of interpretation may well present jury questions." *Murphy v. Seed–Roberts Agency, Inc.,* 79 Mich.App. 1, 8, 261 N.W.2d 198 (1977) (citing *Clark v. Hacker,* 345 Mich. 751, 76 N.W.2d 806 (1956)); *see also D'Avanzo v. Wise & Marsac., P.C.,* 223 Mich.App. 314, 319–320, 565 N.W.2d 915 (1997) (holding that where there is more than one reasonable interpretation of a contract provision, the ambiguity creates a question of fact for the jury). A provision is ambiguous "when its terms are reasonably and fairly susceptible to multiple understandings and meanings." *Equitable Life Assurance Soc. v. Poe,* 143 F.3d 1013, 1016 (6th Cir.1998) (citations omitted).

**\*9**  The Court finds two canons of construction to be particularly relevant to interpreting this contract. First, ambiguities in an insurance policy are to be resolved against the insurer and in favor of the insured, *Clevenger v. Allstate Ins. Co.,* 443 Mich. 646, 654, 505 N.W.2d 553 (1993); and, when a contract is ambiguous, the Court may consider extrinsic evidence to explain the ambiguity, *Goodwin, Inc. v. Coe,* 392 Mich. 195, 205–06 (1974). Second, insurance contracts "must be construed as a whole, and, if possible and practicable, all ... parts are to be harmonized and each part given force and effect." *Caine v. John Hancock Mutual Life Ins. Co.,* 313 F.2d 297, 302 (6th Cir.1963) (citation omitted).

This motion places these two canons at loggerheads with each other. The question of, "[i]s ... premium financing ... being utilized," cast as it is in the present progressive tense, would often be read to inquire whether premium financing is being used at the time the question is answered, as Coventry's proposed construction suggests. This would satisfy the first canon noted above by favoring the insured. But it would violate the second canon by essentially rendering the question meaningless since premiums are never "being paid" at the time that an application for new insurance is filled out.

On the other hand, it is also common English usage to cast a question about a person's future intentions in the present progressive. For instance, the question "are you paying by check?," when asked at the beginning of a restaurant dinner, would typically be understood as an inquiry whether the addressee is currently planning on paying by check at the conclusion of the meal. This is consistent with Phoenix's construction of the question at issue here as encompassing a present plan on the part of the insured [not] to "utilize" premium financing in the future. This construction would have the advantage of fulfilling the second canon noted above, by giving effect to otherwise superfluous language. But the construction would violate the first canon, by adopting an interpretation that favors the insurer over another linguistically permissible interpretation that would favor the insured.

Thus, there is no single interpretation of the premium financing question that would qualify as the correct one under all the applicable legal rules. Under these circumstances, the Court finds that the question and answer are ambiguous, and therefore not appropriate for the court to consider on a motion to dismiss. *See Zbiciak v. Herald Co.,* 49 F. Appx. 501, 504 (6th Cir.2002) (ambiguity in contract creates jury question). Therefore, the Court denies Coventry's motion to dismiss Phoenix's claim for rescission on the grounds of misrepresentation as to the question and answer regarding non-recourse financing in the application for the Second Rosen Policy

B. *Should Count II of the Complaint, Alleging a Claim For Rescission Based Upon A Lack Of Insurable Interest, Be Dismissed?*

**\*10**  Count II of the complaint seeks rescission of the policies on the grounds that there was no insurable interest when the policies were issued. Michigan law provides that insurance contracts issued to a party without an insurable interest in the life of the insured are void. *Sun Life Assur. Co. of Canada v. Allen,* 270 Mich. 272, 284, 259 N.W. 281 (1935). [2] Under Michigan law, an insurance policy "founded upon mere hope and expectation and without some interest in the property, or the life insured, are objectionable as a species of gambling, and so have been called wagering policies .. and are therefore void." *Crossman v. American Ins. Co.,* 198 Mich. 304, 308, 164 N.W. 428 (1917). An insurable interest in the context of life insurance is "a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured." *Dow Chemical Co. v. U.S.,* 250 F.Supp.2d 748, 757 (E.D.Mich.2003) (*quoting Warnock v. Davis,* 104 U.S. 775, 779, 26 L.Ed. 924 (1881)).

Coventry argues that Count II of the complaint should be dismissed because there are no facts alleged that support a rescission based on a lack of insurable interest. Coventry asserts that the only facts that are alleged in support of a lack of insurable interest are the premium finance transaction itself, which Coventry argues is insufficient as a matter of law. Coventry also argues that the assignment of life insurance policies to secure creditors has been deemed valid for over 100 years (citing *Warnock v. Davis,* 104 U.S. 775, 781, 26 L.Ed. 924 (1881); *McDonald v. Birss,* 99 Mich. 329, 332, 58 N.W. 359 (1894)) and that a subsequent

absolute assignment of a life insurance policy for consideration to someone who lacks an insurable interest in the insured is also valid in Michigan. *Prudential Ins. Co. v. Liersch,* 122 Mich. 436, 438, 81 N.W. 258 (1899). Coventry also points out that the plaintiffs themselves provide premium financing to policy owners. Coventry also points out that premium financing is expressly permitted under Michigan law. (citing M.C.L. § 500.1502). Therefore, Coventry argues, there is no legal basis for plaintiffs claim that the Rosen Trust's assignment of the policies to LaSalle Bank as collateral for a premium finance loan states a cause of action. [3]

It is clear that Rosen and the Rosen Trust have an insurable interest in the life of Robert Rosen. The question before the Court is whether the alleged agreements make the contract between the plaintiff and the original policy holders, Rosen and the Trust, merely a cloak for a "wagering contract," which would be impermissible.

The seminal case on the effect of an assignment on the validity of an insurance contract is *Warnock v. Davis,* 104 U.S. 775, 26 L.Ed. 924 (1881). *Warnock* involved an insured who purchased life insurance in the amount of $5,000. *Id.* at 775. The agreement held that nine-tenth's of the amount due and payable under the policy at the time of the insured's death would be the absolute property of the trust company, with the remaining one-tenth subject to the insured's disposition. *Id.* at 775–76. In return, the trust company agreed to maintain the insurance policy at their sole expense. *Id.* at 776. The insured died one year later, and the trust company collected the policy amount and remitted one-tenth of it to the widow of the insured. *Id.* at 777. The representative of the estate sued the trust company for the balance, and the trust company defended on the basis of the assignment agreement. *Id.* at 777–78. The plaintiff argued that the assignment was not valid. *Id.* at 778. The trial court granted judgment to the defendant and the plaintiff appealed. *Id.*

 **\*11**  The Supreme Court reversed, and held that because the association did not have an insurable interest in the life of the policy holder, the assignment of the policy was invalid beyond what was required as security for the trust association's payment of the premiums. *Id.* at 781. The Court held that, beyond that, the purported assignment was a wager policy, and invalid. *Id.* The Court remanded the case with direction to enter judgment for the plaintiff for the amount collected from the insurance company, with interest, after deducting the sums already paid to the widow and the sums advanced by the defendants for premium payments. *Id.* at 782–83.

The holding of *Warnock* was later refined by the case of *Grigsby v. Russell,* 222 U.S. 149, 32 S.Ct. 58, 56 L.Ed. 133 (1911). *Grigsby* involved a bill of interpleader brought by an insurance company to determine whether the proceeds of a life insurance policy issued to the deceased insured, Burchard, should be paid to the insured's administrator or to an assignee. *Id.* at 154. After Burchard had paid two premiums on his policy and the third was overdue, he asked Dr. Grigsby to buy the policy. *Id.* Burchard sold the policy to Grigsby for $100 and Grigsby's agreement to pay the premiums when due. *Id.* The Sixth Circuit Court of Appeals held that, under *Warnock,* the assignment was only valid to the extent of the money actually given for it and the premiums subsequently paid. *Id.*

The Supreme Court reversed, and held that the concerns underlying the insurable interest rule, that it prevents a wager on a human life made by a person that has no interest in the continuation of that life, did not apply in the case of a subsequent assignment. *Id.* at 155. It distinguished *Warnock* by stating that "cases in which a person having an interest lends himself to one without any, as a cloak to what is, in its inception, a wager, have no similarity to those where an honest contract is sold in good faith." *Id.* at 156.

Finally, the Michigan case of *McDonald v. Birss,* 99 Mich. 329, 58 N.W. 359 (1894) makes it clear that the assignment of a life insurance policy to secure creditors is valid, and cannot be voided for lack of insurable interest.

These cases, despite their age, appear to state the current law in Michigan. Applying *Warnock* and *Grimsby* shows that a complete assignment of an insurance policy to LaSalle before or on the same day as the policy was issued would violate the insurable

interest requirement. Under *Grimsby,* a subsequent assignment of the entire proceeds of the insurance policy would *not* violate the insurable interest requirement. Under *Birss,* an assignment of only a *security interest* in the policy would *not* violate the insurable interest requirement, even if that assignment was done at the same time as or even before the policy was issued. Finally, it appears that it *would* violate the insurable interest requirement if, at the time the policies issued, the insured intended to transfer the entire proceeds of the insurance policies to LaSalle, because such an agreement would be a cloaked "wagering contract" under *Warnock* and *Grimsby. See* Couch on Insurance 3d § 36.79 (the consensus is that an assignment is void if it is made in bad faith in order to circumvent the law on insurable interest). The test for determining whether the assignment is valid is the intent of the parties. Couch on Insurance 3d § 36:87.

 **\*12** Applying this law to the allegations of the complaint, it appears that the complaint states a valid claim for rescission based on the lack of insurable interest. Reading the allegations of the complaint in the light most favorable to the plaintiff, the complaint alleges that at the time the policies were issued the insured agreed to transfer not just a security interest, but actual ownership or the right to receive the proceeds of one or both of the policies, to entities that did not have an insurable interest in Robert Rosen's life, and that at least one policy was so transferred. If in fact the defendants made such a contract at or before the time the policies issued, such an agreement would violate the Michigan law requiring an insurable interest at the time the policies were issued. Thus, the Court finds that these allegations state a claim for rescission for lack of insurable interest and therefore the Court will deny defendants' motion to dismiss Count II of the Complaint.

III. *Should Count III Claim for Civil Conspiracy Be Dismissed?*

Count III of the complaint alleges a civil conspiracy on the part of all defendants to defraud Phoenix into issuing the policies. Coventry has moved to dismiss this count under Rule 12(b)(6) for failure to state a claim, and for failure to plead civil conspiracy with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.

A civil conspiracy is a combination of two or more persons to accomplish, by concerted action, either a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means. *Temborius v. Slatkin,* 157 Mich.App. 587, 599–600, 403 N.W.2d 821 (1986). A claim for civil conspiracy must be based on an underlying actionable tort. *Advocacy Org. for Patients & Providers v. Auto Club Ass'n,* 257 Mich.App. 365, 384, 670 N.W.2d 569 (2003). The underlying alleged tort in this case is the fraud that Phoenix claims induced it to issue the policies.

Fraud claims must be alleged with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. Although conspiracy is not listed specifically in Rule 9(b) as a fact that must be alleged with particularity, Coventry argues that conspiracy claims must also be pled with particularity, citing *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 509 (7th Cir.2007) and *Perry v. Se. Boll Weevil Eriadication Found.,* 2005 WL 3051563 at \*8 (6th Cir. Nov.15, 2005).

In order to satisfy the requirements of Rule 9(b) with regard to fraud, a party must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993) (quoting *Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1385 (W.D.Mich.1992)). The complaint clearly does this much: the precise statements that plaintiff claims are fraudulent are recited verbatim in the complaint, along with an identification of the persons making the statements, and the dates of the statements. The complaint also alleges that Rosen and the Trust made the statements with the intent to defraud, and that the plaintiff was injured because it would not have issued the policies if the statements had not been made.

 **\*13** Coventry challenges the sufficiency of the conspiracy allegations. The following paragraphs constitute the conspiracy allegations in PHL's complaint:

49. On or before December 19, 2005, more than four months prior to the March 27, 2006, application for the First Rosen Policy, Rosen and Campagna sought and Coventry offered to arrange non-recourse premium financing for life insurance policies to be purchased by Rosen and/or the Rosen Trust.

50. During the application process for the First Rosen Policy, Phoenix asked whether non-recourse financing is being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being applied for, or whether there was any intent to do so; both Rosen and the Trustee answered "No" in writing, and declared their statements to be complete and true to the best of their knowledge.

51. During the application process for the Second Rosen Policy, Phoenix again asked whether non-recourse financing is being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being applied for, or whether their was any intent to do so; both Rosen and the Trustee again answered 'No" in writing, and declared their statement to be complete and true to the best of their knowledge.

52. Relying on the representations of Rosen and the Trustee, Phoenix issued the First and Second Rosen Policies; those representations have turned out to be false.

53. The defendants knew about the plan to use non-recourse financing to pay premiums in order to facilitate a transfer, assignment or other action with respect to the benefits provided under the Phoenix policies being applied for and to not disclose the plan to Phoenix; knew about the misrepresentations to Phoenix in furtherance of said plan; and participated in and/or encouraged and/or aided and abetted the implementation of said plan to defendants' mutual advantage and Phoenix's detriment.

54. Defendants Coventry, Wilmington, CBI, Raider–Dennis, and Campagna have benefited from implementation of said plan, among other ways, through the splitting among themselves of hundreds of thousands of dollars in commissions paid by Phoenix relating to issuance of the First and Second Rosen Policies, commissions Phoenix would not have paid but for the misrepresentations which led it to issue said Policies.

55. Defendants LaSalle N.A. and LaSalle Corporation have benefited from implementation of said plan, among other ways, through the making of loans for the payment of premiums on the First and Second Rosen Policies, which loans have been secured by said Policies, and through the assignment and/or transfer of the beneficial interest in said Policies from defendants Rosen and the Rosen Trust to LaSalle N.A. and/or LaSalle Corporation.

56. Defendants Rosen and the Rosen Trust have benefited from implementation of said plan, among other ways, through the obtainment of insurance policies from Phoenix they would not have obtained but for their misrepresentation during the application process, and the receipt of financial and other consideration from some or all of the other defendants.

**\*14** 57. On information and belief, Raider–Dennis and Campagna have been in communication with other defendants including, but not necessarily limited to, Coventry and the Trustee regarding a strategy to thwart Phoenix's efforts to rescind the First and Second Rosen Policies and be reimbursed for commissions paid regarding said Policies.

58. As a result of defendants' conspiracy to defraud, Phoenix has been injured by having paid some $549,272.90 in commissions on insurance policies which were issued in reliance upon misrepresentations and thus were void ab initio, and having incurred and continuing to incur substantial costs and expenses in order to undo the transactions that resulted from defendants' conspiracy to defraud.

Reviewing the forgoing allegations in the light most favorable to the plaintiff, it appears that Phoenix has adequately alleged the time, place and manner of the allegedly fraudulent statements and the defendants' alleged participation in them. The plaintiff alleges that Rosen and the Rosen Trust made specific representations in their applications for the policies which were false at the time they were made. The plaintiff further alleges that the defendants knew about the misrepresentations, they participated in, encouraged or aided and abetted those misrepresentations; that the policies would not have been issued had the misrepresentations not been made; and that the defendants benefitted from the misrepresentations by splitting among themselves several hundred thousand dollars in commissions, paid by the plaintiff as a result of the policies being issued. Therefore, the Court finds that the complaint adequately states a claim for civil conspiracy as to all defendants.

The cases cited by Coventry do not dictate dismissal under these facts. Instead, as the following discussion indicates, the cases suggest dismissal is appropriate where the complaint fails to allege any facts from which a jury could conclude that a conspiracy existed, which is not the case here.

In *Perry v. Se. Boll Weevil Eradication Found.,* 2005 WL 3051563 (6th Cir. Nov.15, 2005), plaintiffs alleged that they were injured by the spraying of malathion that occurred between July 15, 2000 and December 31, 2001 and that the defendants conspired to do so, but the plaintiffs did not set forth any additional factual allegations indicating when, where or how the defendants conspired to spray the malathion in a manner damaging to the plaintiffs. *Id .* at *8 Therefore, the court found that they had failed to plead, with particularity, their conspiracy claim. *Id.*

In *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502 (7th Cir.2007), the Seventh Circuit affirmed an order of the district court dismissing claims of tortious interference with economic advantage, interference with fiduciary relationship and civil conspiracy for failure to meet the heightened pleading requirement of Rule 9(b). The plaintiff, Borsellino, was a partner in a business that facilitated stock trading through remote access to the NASDAQ. *Id.* at 505. His former partners got together and formed another business for the purpose of permitting easier remote access through various locations. *Id.* at 506. Borsellino claimed that these former partners acted behind his back and used partnership resources to create the new venture, and that as a result he had rights in the new venture, in which Goldman Sachs became part-owner. *Id.* Borsellino sued Goldman Sachs, claiming that it had conspired with the plaintiff's former business partners to commit deprive him of his rightful interest in the new business. *Id.* The complaint alleged that Goldman was aware that Borsellino had an interest in the venture and conspired with the other partners to wait until the partnership with Borsellino could be terminated before making an investment. *Id.*

**\*15** As to the claims of tortious interference with economic advantage and interference with fiduciary relationship, the Seventh Circuit held that the allegations that Goldman Sachs conspired with the partners to cut the plaintiff out of the deal "made neither economic nor common sense" therefore plaintiff did not plausibly state a claim for a conspiracy, and the allegation that Goldman Sachs "accepted the benefits" of a breach of fiduciary duty failed because the complaint failed to allege how the breach could benefit Goldman Sachs. *Id.* at 508–09. As to the claim of civil conspiracy, the Seventh Circuit held that claim failed because the complaint failed to state with particularity the circumstances constituting the conspiracy between Goldman Sachs and the plaintiff's former partners. *Id.* at 509. The allegations in the complaint were merely that Goldman Sachs participated in testing the partners' system for SEC compliance and did not invest in the system until the principals had cut off business ties with the plaintiff. *Id.* The Seventh Circuit held that "[t]his fact and a handful of unreasonable inferences are not enough to satisfy Rule 9(b)'s particularity requirements" and affirmed the dismissal of the civil conspiracy claim against Goldman Sachs. *Id.*

Likewise, in *Spadafore v. Gardner,* 330 F.3d 849 (6th Cir.2003) the Sixth Circuit affirmed summary judgment in a 42 U.S.C. § 1983 claim where the plaintiffs had "submitted no evidence, circumstantial or otherwise, suggesting that the defendants had a single plan when they made the allegedly false statements." *Id.*

Finally, the case of *Tramontana v. May,* 2004 WL 539065 (E.D.Mich. March 16, 2004), cited by Coventry in support of its argument that dismissal is appropriate here, actually undermines Coventry's argument. While the court there did hold that conspiracy claims grounded in fraud must satisfy the particularity requirements of Rule 9(b), the court in that case found the allegations sufficient under Rule 9(b) where the complaint alleged that several individuals and entities "illegally, maliciously, and wrongfully conspired with with one another with the intent to and for the illegal purpose of: A. Fraudulently inducing [the counterplaintiffs] to invest in Graminex; and B. Assisting [counterdefendant] Tramontana in his breaches of fiduciary duty to [counterplaintiffs]" *Tramontana* at *8. The court held that because the "averments of fraud in this count of the counterclaim refer to the specific allegations already set forth in Count I alleging fraudulent inducement," they were pleaded with sufficient specificity to satisfy Rule 9(b). *Id.*

Here, as in *Tramontana,* the precise misrepresentations, the dates the alleged misrepresentations were made, and the persons who allegedly made the misrepresentations are all stated with particularity, while the complaint also sets forth facts from which

a factfinder could find circumstantial evidence of a conspiracy, including facts showing that the other defendants were aware of the applications before they were made and facts that tend to show that the other defendants, including Coventry, benefited from the alleged misrepresentations. The cases cited by defendants do not require anything more. Specifically, the cases cited by defendants do no require the "time, place, manner" of the actual conspiracy, the dates of meetings and so forth. Thus, the Court finds that Phoenix's conspiracy claims are sufficiently specific for purposes of Rule 9(b) of the Federal Rules of Civil Procedure.

**\*16** Defendants argue that a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate actionable tort, and argue that because the plaintiffs have not alleged any actionable tort theories their claim for civil conspiracy also fails. The Court, however, has found that the Complaint states a prima facie claim for misrepresentation as to the Second Rosen Policy. Furthermore, while the fact that the alleged misrepresentations are not attached to the policies defeats a claim for rescission under the Michigan statute, defendants have offered no authority that such misrepresentations cannot form the basis for a separate tort action, provided the elements for common law fraud are otherwise met. The Michigan statute merely says that fraud is not a basis for avoiding the policy if the alleged fraudulent statements are not attached to the policy—it does not say that no claim can be based on the allegedly fraudulent statements.

Defendants, citing *Bell Atl. Corp.,* 127 S.Ct. at 1965, argue that plaintiffs' conspiracy claim is not plausible. Coventry argues that the claim rests on the premise that LaSalle Bank, in conspiracy with the other defendants, would extend loans exceeding $750,000 secured by fraudulently procured life insurance policies and it is not credible to argue that LaSalle Bank would accept such tainted collateral, together with potential legal liability, to secure valuable loans. This argument highlights the distinction between this case and *Bell Atlantic,* which also involved a motion to dismiss in the context of pleading a civil conspiracy, albeit not in the context of fraud.

In *Bell Atlantic,* the Court found that the complaint had failed to state a claim for civil conspiracy under Section 1 of the Sherman Act where the only facts alleged by the plaintiffs in support of their conspiracy claim was parallel conduct, and conscious parallelism does not, as a matter of law, violate the Sherman Act absent an agreement between the defendants. *Id.* at 1970–71. Further, the Court found allegations that the defendants engaged in parallel conduct did not raise an inference of agreement in that case because the defendants had every economic incentive to act the way they did even without an agreement to do so. The Court held that where the complaint fails to plead facts that suggest a conspiracy, and, under the facts alleged an actual conspiracy is implausible, the complaint fails to state a claim for civil conspiracy. *Id.* at 1974

Here, in contrast to those in *Bell Atlantic,* the conspiracy allegations are not implausible. Instead, the complaint alleges that the defendants communicated among themselves prior to the issuance of the policies, they "participated in and/or encouraged and/or aided and abetted the implementation of said plan to defendants' mutual advantage and Phoenix's detriment," that they benefited from the issuance of the policies in sharing several hundred thousand dollars of commissions that would not have been paid if the policies had not been issued, and that the policies would not have been issued absent fraud on the part of the insured. These allegations may not be factually supported, but they are not "implausible" under *Bell Atlantic.*

**\*17** The Court has considered the other arguments made by defendants in support of their motion to dismiss Count III, and finds them to be variations of the argument already addressed. It is sufficient to state that the Court has considered each and every one and finds them to be disposed of by the reasoning above. Therefore, for the reasons stated above, the Court will deny defendants' motion to dismiss Count III of the complaint.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** defendants' motion to dismiss the complaint. Defendant's motion to dismiss as to claims for declaratory judgment as to defendants Rosen and the Rosen Trust is **GRANTED IN PART AS FOLLOWS:** Plaintiffs' claims for declaratory judgment and rescission in Counts I and II are **DISMISSED** as to defendants Coventry and CBI and plaintiffs' claim for declaratory judgement of rescission in Count I is

**DISMISSED** as to Rosen and the Rosen Trust as to the First Rosen Policy. Defendants' motion to dismiss in all other regards is hereby **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 877684

Footnotes

1    In its response, PHL has appended documents and alleged various facts concerning communications between the defendants before and after the issuance of the policies. The Court will disregard these facts in deciding the motion to dismiss, because, as the plaintiffs correctly point out, the plaintiffs may not amend their complaint by means of their response brief. *See*  *Begala v. PNC Bank, Ohio, Nat'l Ass'n,* 214 F.3d 776, 784 (6th Cir.2000) (complaint may not be amended by briefs in opposition to motion to dismiss).

2    The facts of *Sun Life* illustrate the policy concerns behind the insurable interest requirement. *Sun Life* involved a partnership that had taken out insurance policies on two men that were made partners at the same time the partnership took out the insurance policies on their lives:

   The mortality among the partners of Charles Elson was rather high. Federowitz, a partner, died March 21, 1922, at the age of thirty-three, of either lobar pneumonia or delirium tremens, with $27,500 of life insurance payable to Elson, Goodstein, and Allen, for which application had been made on February 25, 1921. Stanislaus Bogacki, another partner, died at the age of forty-four from a cause given in his death certificate as 'fall down stairs in home, fracture of skull, alcoholism,' with $15,000 of insurance payable to the firm, the policy having been issued only three months after the death of Federowitz. Bogacki lived less than three years after his policy was issued. The record is silent as to Allen and Goodstein; all we know is they did not appear as witnesses in the instant case.

   *Sun Life,* 270 Mich. at 282, 259 N.W. 281.

3    Phoenix argues that before the policies ever issued, and before Rosen and the Rosen Trust formally transferred their legal interests in the policies, they had already transferred their equitable interest in the policies to other defendants who lacked insurable interests in the policies. Phoenix does not cite any authority for this proposition, and the Court is aware of no authority that applies the doctrine of equitable conversion other than in the context of real estate.

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    14

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Baugh v. Delta Air Lines, Inc., N.D.Ga., February 23, 2015

2010 WL 2867123

Only the Westlaw citation is currently available.

United States District Court,

N.D. California.

Rosemary RUSSELL, Plaintiff,

v.

SKYWEST AIRLINES, Inc., United Airlines, Inc., Air Serv

Corporation and Does 1 through 50, inclusive, Defendants.

No. C 10–0450 MEJ.

|

July 20, 2010.

|

As Amended Aug. 11, 2010.

West KeySummary

1   **Carriers** 👉 Actions for Injuries

   **Carriers** 👉 Rights of Action and Defenses

   **States** 👉 Carriers;  Railroads

   California negligence claims raised by elderly airline passenger who was blind in one eye and required assistance in exiting the airplane were preempted by the Air Carrier Access Act (ACAA). Passenger's goddaughter put the airline on notice of passenger's disability and assistance requirements. Passenger did not file a complaint with the Secretary of Transportation to exhaust her administrative remedies before filing her civil suit to recover for injuries sustained while exiting aircraft. 29 U.S.C.A. § 41705 et seq.; 49 U.S.C.A. §§ 46101(a), 46110(a); 14 C.F.R. § 382.954(a).

**Attorneys and Law Firms**

Nicole Cohrs, Thomas John Rotert, Davis Zfaty, APC, Laguna Beach, CA, Thomas Phillip Davis, Attorney at Law, Laguna Beach, CA, for Plaintiff.

Kimberly Irene McIntyre, Kymberly E. Speer, Kenney & Marokowitz L.L.P., San Francisco, CA, Kristin Amelia Winter, Stephen Lester Nelson, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (DKT.# 14)**

MARIA–ELENA JAMES, United States Chief Magistrate Judge.

**I. INTRODUCTION**

**\*1** Before the Court is Defendants Skywest Airlines, Inc. and United Airlines, Inc. (collectively "Defendants") Motion for Judgment on the Pleadings. [1] (Dkt.# 14.) On May 13, 2010, the Court held a hearing on the matter. After consideration of the parties' papers and oral arguments, relevant legal authority, and good cause appearing, the Court orders as follows.

## II. BACKGROUND

On January 7, 2010, Plaintiff Rosemary Russell ("Plaintiff") filed a complaint in Superior Court for the County of San Francisco, alleging state law causes of action of negligence against Defendants. (Removal Pet., Ex. A [2], Dkt. # 1.) In her complaint, Plaintiff alleges that she was injured on June 29, 2009, while exiting a Skywest commuter plane which carried her from Orange County to San Francisco. (Pl.'s Compl. ¶ 10, Dkt. # 1.) Plaintiff states that this is the type of plane passengers exit by walking down a small staircase which is attached to the plane and unfolded when it is time to disembark. *Id.* at ¶ 13. Plaintiff states that she is an elderly woman who is blind in one eye, and thus required assistance when deplaning. *Id.* at ¶ 14. Plaintiff claims that her goddaughter called Defendants [3] prior to Plaintiff's flight to inform them that Plaintiff was an elderly woman and blind in one eye, and to request that they provide her assistance while disembarking from her flight. *Id.* at 14. Plaintiff contends that, despite this notification, no one assisted her in exiting from the plane. *Id.* at ¶ 16. Plaintiff alleges that while descending the staircase without assistance, when stepping off the last step, she scraped her leg on the staircase and sustained a large cut. *Id.* at ¶ 15. Plaintiff claims that she woke up feeling ill the following day and had to be admitted to the hospital. *Id.* at ¶ 17. Plaintiff was informed by the doctors that the wound was infected, that she had developed cellulitis, and that she required a blood transfusion. *Id.* Plaintiff spent ten days in the hospital, during which time her unimpaired eye hemorrhaged. *Id.* at ¶ 18. As a result, Plaintiff is now completely blind, cannot live alone and was forced to move out of her apartment into an assisted living facility. *Id.* at ¶¶ 18, 19.

Plaintiff alleges that Defendants, as common carriers under California Civil Code 2168 [4], owe her a duty of care that is substantially higher than the care required of a reasonable person under similar circumstances, pursuant to California Civil Code section 2100 [5]. *Id.* at ¶¶ 21, 22. Plaintiff alleges that Defendants breached that duty by failing to assist her when she deplaned. *Id.* at ¶ 23. Plaintiff further alleges that Defendants' breach was the proximate and legal cause of her injuries. *Id.* at ¶¶ 24–27. Plaintiff also alleges general negligence. *Id.* at ¶¶ 28–34.

On February 1, 2010, Defendants removed the instant action to this Court pursuant to 28 U.S.C. §§ 1332(a) and 1446(a). (Removal Pet. ¶¶ 3, 4, Dkt. # 1.) On April 5, 2010, Defendants filed the instant Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). (Dkt.# 14.) On April 22, 2010, Plaintiff filed her Opposition (Dkt.# 22), and on April 29, 2010, Defendants filed their Reply (Dkt.# 24). Defendants also filed a request for judicial notice of an order issued by the Central District of California (Dkt.# 25), and a Statement of Recent Decision (Dkt.# 26). At the May 13 hearing, the Court noted that the crux of Defendants' argument in support of their motion for judgment on the pleadings was raised for the first time in their reply and thus ordered Defendants to submit further briefing, which they did later that day. (Dkt.# 28.) On May 14, 2010, Plaintiff filed an objection to Defendants' supplemental brief. (Dkt.# 29.) On June 23, 2010, the Court ordered Plaintiff to file a surreply, which she filed on June 30, 2010. (Dkt.# 31.)

## III. DISCUSSION

**\*2** In their Motion, Defendants argue that Plaintiff's claims for common carrier and general negligence fail to state a claim upon which relief may be granted because the relevant standard of care is established by federal rather than state law, and thus Plaintiff's state law negligence claims are preempted. (Defs.' Mot. 4:12–19, Dkt. # 14.) Specifically, Defendants contend that the Federal Aviation Act of 1958, 49 U.S.C. §§ 40101 *et seq.* ("FAA"), preempts the entire field of aviation safety, *id.* at 1:9–

13, and that Plaintiff has failed to allege that a duty owed to her under federal law was breached. *Id.* at 8:2–4. Thus, Defendants argue that judgment in their favor is appropriate.

In response, Plaintiff argues that the FAA will only preempt state law claims where the agency has issued pervasive regulations in that specific area. (Pl.'s Opp'n 3:1–10, Dkt. # 22.) Plaintiff contends that, in the instant case, the state standard of care remains applicable because there are not pervasive regulations regarding an airline's handling of passengers who request assistance getting on an off an aircraft. *Id.* at 3:16–20. Accordingly, Plaintiff argues that her complaint states claims upon which relief may properly be granted. *Id.*

In their reply and further briefing, Defendants also contend that Plaintiff's claim for negligence is preempted by the Air Carrier Access Act of 1986, 29 U.S.C. § 41705 ("ACAA") and its implementing regulations, which are codified in Title 14 of the Code of Federal Regulations as Part 382. (Defs.' Reply 9:9–11, Dkt. # 24; Defs.' Br. 2:1–3, Dkt. # 28.) Defendants maintain that the interaction between air carriers and disabled passengers is regulated by the ACAA, and argue that Plaintiff effectively alleged that she was disabled because at the time of the incident she was elderly and blind in one eye. (Defs.' Reply 9:7–10, Dkt. # 24.)

In response to Defendants' ACAA preemption argument, Plaintiff argues that she never claimed to be disabled, and that asking for assistance does not mean that she admitted a disability, as Defendants contend. (Pl.'s Surreply 5:18–19, Dkt. # 31.) Plaintiff maintains that Congress did not intend to abolish the right to present state law injury claims, and because the ACAA has no private right of action, a finding that the ACAA preempts Plaintiff's state law claims would go against Congressional intent. *Id.* at 5:20–26.

## A. Legal Standard

Rule 12(c) provides that a party may move for judgment on the pleadings after the pleadings are closed, but must do so early enough that trial will not be delayed. The close of pleadings refers to the time when all required pleadings, namely the answer, have been served and filed. *In re Villegas,* 132 B.R. 742, 745 (9th Cir.BAP1991); *Strigliabotti v. Franklin Resources, Inc.,* No. C 04–0883 SI, 398 F.Supp.2d 1094, 1098 (N.D.Cal.2005). "[J]udgment on the pleadings is properly granted when, taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978–79 (9th Cir.1999) (internal citations omitted). However, "[i]f the [c]ourt determines that the complaint fails to state a claim, leave to amend should be granted to the extent that the deficiencies of the complaint can be cured by amendment." *Hill v. Skywest Airlines, Inc.,* 2008 WL 4816451, at *3 (E.D.Cal. November 5, 2008) (citing *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (en banc)).

## B. Application to the Case at Bar

### 1. *Whether the FAA Preempts Plaintiff's Claims*

**\*3** In their Motion for Judgment, Defendants contend that the FAA occupies the entire field of aviation safety, thus preempting Plaintiff's state law negligence causes of action. (Defs.' Mot. 4:12–19, Dkt. # 14.) Specifically, Defendants claim that the FAA preempts the heightened standard of care pled by Plaintiff because her claim alleges negligence for failure to assist a deplaning passenger. *Id.* at 5:14–26. Thus, Defendants argue that they are entitled to judgment as a matter of law because Plaintiff has not pled a breach of a federal regulation. *Id.* at 1:13–15; 4:13–15.

In response, Plaintiff argues that Defendants have misinterpreted Ninth Circuit law and that her claims are not preempted because Congress has not shown an intent to occupy the field of aviation safety as applied to her claims. (Pl.'s Opp'n 3:14–20, Dkt. # 22.) Specifically, Plaintiff contends that there are not pervasive regulations regarding an airline's handling of passengers who request assistance getting on an off an aircraft. *Id.* at 3:16–20.

Where a federal regulation does not expressly state that it will preempt state law in a specific area, but the structure and purpose of the federal law indicate that Congress intended federal law to occupy the field, the state law will be deemed preempted.

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). "Implied preemption exists when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Montalvo v. Spirit Airlines,* 508 F.3d 464, 470 (9th Cir.2007) (citing *Cipollone,* 505 U.S. at 516) (internal quotations omitted). In order to determine whether Congress intended federal legislation to occupy the entire field of airline safety regulation, courts must "look to the pervasiveness of the regulations enacted pursuant to the relevant statute to find preemptive intent." *Montalvo,* 508 F.3d at 470. However, "[i]n areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.,* 555 F.3d 806, 812 (9th Cir.2009).

In *Montalvo,* the Ninth Circuit addressed the issue of whether the FAA preempted California state law standards of care, specifically the state-imposed duty to warn. [6] *Montalvo,* 508 F.3d at 468. The court found that the pervasiveness of the regulations governing the warnings and instructions which must be given to airline passengers, such as the instructions regarding seatbelt, seat back, and tray table use and the warnings about prohibitions against smoking [7], indicate that Congress, through the Federal Aviation Administration, intended federal law to control in the warning and instruction area. *Id.* at 472–73.

The issue here, then, is whether there are pervasive regulations regarding passenger requests for assistance or other grounds for preemption which would prevent Plaintiff from alleging her state law personal injury claims. The Court is unaware of any regulations under the FAA which govern a passenger's request for assistance or an airline's failure to assist a passenger who has indicated that they need assistance. Thus, the Court finds that there are not pervasive regulations under the FAA which would indicate Congress' intent to preempt Plaintiff's state law negligence claims.

**\*4** However, *Hill v. Skywest Airlines, Inc.* 2008 WL 4816451 (E.D.Cal.2008), sheds further light on Plaintiff's claim. In *Hill,* the plaintiff sued the defendant, alleging general negligence when she fell and injured herself while exiting a plane. *Id.* at \* 1. Similar to this Court's finding, the court found that there was no specific regulation that spoke to the plaintiff's claim of negligence for failure to assist an able-bodied person in deplaning. *Id.* at \*8–9. However, the court did find that there was an applicable federal standard of care "that does not necessarily preclude a claim involving a duty affirmatively to help a passenger with deplaning." Specifically, 14 C.F.R. § 91.13(a) provides that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." Based on the existence of an applicable federal standard of care, the court in *Hill* dismissed the plaintiff's complaint with leave to amend "insofar as it was based on state standards of care." *Hill,* 2008 WL 4816451, at \*11.

Here, Plaintiff also alleges that Defendants were negligent in failing to assist her in deplaning. (Pl.'s Compl. ¶¶ 14–16, Dkt. # 1.) Thus, because there is an applicable federal standard of care, Plaintiff's state law claims are preempted, and she must plead a breach of 14 C.F.R. § 91.13(a) [8]. Accordingly, based solely on Plaintiff's failure to assist claim, it would appear that Plaintiff should be entitled leave to amend her complaint to plead a breach of the federal standard of care. However, unlike the plaintiff in *Hill,* Plaintiff requested assistance in deplaning, thus raising potential disability issues under the ACAA, which the Court shall address below.

### 2. *Whether the ACAA Preempts Plaintiff's Claims*

In their further briefing, Defendants maintain that the ACAA preempts Plaintiff's state law negligence claims. (Defs.' Supp. Br. 2:1–2, Dkt. # 28.) Specifically, Defendants contend that Plaintiff's allegation that she was elderly and blind in one eye at the time of the incident is tantamount to an allegation that she was disabled. (Defs.' Reply 9:7–8, Dkt. # 24.) Defendants argue that

the interaction between air carriers and disabled passengers is solely regulated by the ACAA, which establishes the applicable federal standard of care. *Id.* at 9:9–11; 9:26–27.

In response, Plaintiff asserts that her claims should not be barred under the ACAA because she did not claim that she was disabled, and that asking for assistance does not equate to admitting a disability. (Pl.'s Surreply 5:18–19, Dkt. # 31.) Plaintiff argues that Congress never intended to deny citizens a private right of action against air carriers, noting that the ACAA has no private right of action. *Id.* at 4:12–14.

14 C.F.R. § 382.3 provides that an individual with a disability is any person "who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." A physical impairment includes visual impairment. 14 C.F.R. § 382.3(a)(2). "Major life activities" includes functions such as seeing. 14 C.F.R. § 382.3(b). If someone is regarded as having an impairment, it means they are treated as having such an impairment by an air carrier. 14 C.F.R. § 382.3(d). Air carriers have the obligation to provide or ensure that assistance is provided when requested by or on behalf of passengers with a disability. 14 C.F.R. § 382.95(a).

**\*5**  "[T]he regulations promulgated under the ACAA, which implicate both safety and nondiscrimination mandates, establish with specificity an air carrier's obligations to provide disabled passengers with assistance .... " (*Johnson v. Northwest Airlines, Inc.,* C 08–2272 VRW, May 5, 2010, *Order* 13:7–11, Dkt. # 157.) These "extensive regulation[s are] of the sort contemplated by the Ninth Circuit in *Martin* and *Montalvo,* implying an intent by Congress to preempt state-law in this area." *Id.* at 13:14–17.

Here, Plaintiff's goddaughter put the airline on notice that Plaintiff was blind in one eye and thus required assistance in deplaning. (Pl.'s Compl. ¶ 14, Dkt. # 1.) Thus, this is not a case of Defendants "determin[ing] whether or not an individual is disabled," as Plaintiff contends. (Pl.'s Surreply 5:21–22, Dkt. # 31.) Because Plaintiff's goddaughter alerted the airline that she was blind in one eye and needed assistance, the airline had knowledge of Plaintiff's vision impairment and Plaintiff could therefore be regarded as having such an impairment under 14 C.F.R. § 382.3. The implementing regulations provide that air carriers have the obligation to ensure that assistance is provided when requested by or on behalf of passengers with a disability. 14 C.F.R. § 382.95(a). While the Court is sympathetic to the fact that there is no private right of action under the ACAA [9], it must find that Plaintiff belongs to the class of persons covered by the implementing regulations. [10] Accordingly, the Court finds that Plaintiff's state law negligence claims are preempted. To pursue her claim, Plaintiff must file a complaint with the Secretary of Transportation. 49 U.S.C. § 46101(a). Only when she has exhausted her administrative remedies may she file a civil action. 49 U.S.C. § 46110(a). Thus, because Plaintiff must exhaust her administrative remedies, she cannot cure the deficiencies of her complaint and leave to amend would be futile.

## IV. CONCLUSION

Based on the foregoing, the Court GRANTS Defendants' Motion for Judgment on the Pleadings. Although Defendant Air Serv Corporation did not join in Defendants' motion, Plaintiff's claims against it are identical, therefore, her complaint also fails to state a claim against Defendant Air Serv. As the deficiencies in Plaintiff's complaint are beyond cure, she is not entitled to leave to amend. Accordingly, Plaintiff's complaint is hereby DISMISSED WITHOUT LEAVE TO AMEND and judgment is entered in favor of all named Defendants.

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2010 WL 2867123

Footnotes

1       Defendant Air Serv Corporation has not joined in Defendants' Motion.

2       All further references to Plaintiff's complaint will be cited as "Complaint".

3       Plaintiff does not specify which Defendant was contacted by her goddaughter.

4       This section provides that "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic
        messages, is a common carrier of whatever he thus offers to carry."

5       This section provides that "[a] carrier of persons for reward must use the utmost care and diligence for their safe carriage, must
        provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill."

6       The duty to warn at issue in *Montalvo* involved the risks of deep vein thrombosis ("DVT"), which results from prolonged, cramped
        sitting, causing blood clots in the deep veins in the legs and can cause serious complications.

7       The regulations governing the warnings and instructions which must be given to airline passengers are set forth in 14 C.F.R. Parts
        25 and 121 (2005).

8       At the hearing, Plaintiff informed the Court that 14 C.F.R. § 91.13(b) governs the standard of care for aircraft on the ground, but
        submitted that the standard was the same in section (a) as in (b). 14 C.F.R. § 91.13(b) provides: "Aircraft operations other than for the
        purpose of air navigation. No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface
        of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo),
        in a careless or reckless manner so as to endanger the life or property of another."

9       This Court has previously discussed the absence of a private right of action under the ACAA in *Kerner v. Mendez,* C 08–4528 EDL
        Dkt. # 27; 2009 WL 1226998, at *3 (N.D.Cal.2009).

10      Beyond the ACAA regulations which speak directly to Plaintiff's situation, there are other regulations which govern the interaction
        between air carriers and disabled passengers: 14 C.F.R. § 382.97 ("To which aircraft does the requirement to provide boarding
        and deplaning assistance through the use of lifts apply[,]" which further discusses boarding and deplaning assistance); 14 C.F.R. §
        382.99 ("What agreements must carriers have with the airports they serve[,]" providing that air carriers must have agreements with
        airport operators regarding the provision of lifts and ramps for deplaning); 14 C.F.R. § 382.101 ("What other boarding and deplaning
        assistance must carriers provide.")

                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Segalman v. Southwest Airlines, E.D.Cal., October 24, 2012

2008 WL 4104505

Only the Westlaw citation is currently available.

United States District Court,

E.D. Michigan,

Southern Division.

Deborah THOMAS, James Keskeny, Jill Babcock, Martin Drouillard, & Emma Daniels, Plaintiffs,

v.

NORTHWEST AIRLINES CORPORATION and Wayne County Airport Authority, Defendants.

No. 08-11580.

|

Sept. 2, 2008.

**Attorneys and Law Firms**

David M. Cohen, Richard H. Bernstein, Samuel I. Bernstein Assoc., Farmington Hills, MI, for Plaintiffs.

Tiffany A. Buckley, Timothy H. Howlett, Dickinson Wright, Detroit, MI, for Defendants.

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
NORTHWEST AIRLINE CORPORATION'S MOTION FOR DISMISSAL (DOCUMENT # 6)*

GEORGE CARAM STEEH, District Judge.

**\*1** This matter comes before the Court on Defendant Northwest Airlines Corporation's ("NWA") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Oral argument was heard on July 10, 2008. For the reasons set forth below, the Court will grant the motion in part and deny the motion in part.

*BACKGROUND*

Plaintiffs filed this lawsuit against NWA and the Wayne County Airport Authority (the "Airport Authority") alleging that both Defendants have failed to comply with the Air Carrier Access Act, 49 U.S.C. § 41705 ("ACAA") and Department of Transportation ("DOT") rules promulgated thereunder, 14 C.F.R. Part 382 et seq.; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"). NWA filed the present Motion to Dismiss for failure to state a claim. The Airport Authority also filed a Motion for Partial Dismissal solely on the ACAA claim. Plaintiffs have since stipulated to the entry of an Order dismissing the ACAA claim only against the Airport Authority. As a result, the Airport Authority's motion is no longer before the Court.

NWA and the Airport Authority provide access to air travel and attendant facilities at Detroit Metro Airport, including but not limited to McNamara Terminal, Smith Terminal, and adjoining areas such as parking facilities. NWA is one of the world's largest commercial airlines and operates over fifteen thousand flights a week worldwide. Many of these flights originate from the McNamara terminal at Detroit Metro Airport, but NWA also has hubs in Minneapolis/St. Paul, Memphis, Tokyo, and Amsterdam. The Airport Authority is the state government-chartered entity that oversees Detroit Metro Airport.

Plaintiffs are five disabled individuals who each claim that NWA and the Airport Authority discriminate against them and other disabled individuals by imposing obstacles to air travel not encountered by those without disabilities. Plaintiffs allege that Defendants fail to provide adequate access or assistance on the aircraft and throughout the terminal and attendant facilities in a variety of ways. Among other things, Plaintiffs have missed flights due to a lack of prompt or adequate assistance, have been dropped to the ground when being assisted onto aircraft, and have suffered repeated damage to their wheelchairs due to improper handling and stowing.

Plaintiffs originally attempted to resolve issues regarding the lack of accessibility through a series of conversations and meetings with both Defendants in 2006. The Airport Authority, in conjunction with NWA, voluntarily committed in October 2006 to improving access for the disabled, agreeing among other things, to allow for an independent audit of the facilities and services at Detroit Metro Airport. Plaintiffs allege that it is unknown if the audit actually took place and that both Defendants continually fail to comply with obligations to provide access to disabled persons. Plaintiffs express concerns that treatment of disabled airline passengers does not appear to be improving.

**\*2** Plaintiffs seek a declaration that their rights were violated, as well as injunctions: 1) restraining Defendants from receiving further federal licensing or funding until they provide equal access to individuals with disabilities, 2) ordering Defendants to provide equal access and allowing Plaintiffs to review any construction plans prior to their implementation, and 3) restraining Defendants from further discrimination.

In its Motion to Dismiss, NWA contends that the ACAA does not provide a private right of action, that the text of the ADA explicitly bars plaintiffs from bringing a claim against an airline, and that the Rehabilitation Act does not apply to airline carriers.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on an issue of law. To survive a Rule 12(b)(6) motion for dismissal for failure to state a claim, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir.2007). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic,* 127 S.Ct. at 1964-65. In so holding, the Supreme Court disavowed the traditional Rule 12(b)(6) standard of *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) which required the appearance, "beyond a doubt, that plaintiff can prove no set of facts in support of claim that would entitle him to relief." *Bell Atlantic,* 127 S.Ct. at 1969.

## ANALYSIS

### I. Air Carrier Access Act

The Air Carrier Access Act of 1986, 49 U.S.C. § 41705, protects disabled individuals from discrimination by "air carriers" on the basis of mental or physical impairment. Specifically, 49 U.S.C. § 41705 states that:

In providing air transportation, an air carrier ... may not discriminate against an otherwise qualified individual on the following grounds:

(1) the individual has a physical or mental impairment that substantially limits one or more major life activities.

(2) the individual has a record of such an impairment.

(3) the individual is regarded as having such an impairment.

NWA does not dispute that Plaintiffs are qualified individuals, but argues that Plaintiffs' ACAA claim should be dismissed because the ACAA does not provide for a private right of action. NWA contends that the text of the ACAA and the DOT regulations promulgated thereunder create a comprehensive enforcement scheme which demonstrates that Congress did not intend, expressly or by implication, to create a private right of action.

In determining whether a private right of action exists, the Supreme Court has found that the intent of Congress is controlling. *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). In *Sandoval,* which did not make any reference to the ACAA itself, the Court stated that:

> **\*3** Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Sandoval,* 532 U.S. at 286-87 (citations and internal quotations omitted). The Court found that it could limit its search for legislative intent to the text of the provision itself and the statutory structure in which it was embedded. *Id.* at 288.

Defendants rely on *Love v. Delta Air Lines,* 310 F.3d 1347, 1351-52 (11th Cir.2002) and *Boswell v. Skywest Airlines, Inc.,* 361 F.3d 1263, 1267 (10th Cir.2004), which both followed the analysis set out in *Sandoval* and found that there is no private right of action under the ACAA. Defendants point to the text of the ACAA and its accompanying regulations to support their contention that Congress did not implicitly intend for there to be a private right of action. Specifically, 49 U.S.C. § 46101(a) (1) states that an individual with a disability may file a complaint with the DOT about an individual allegedly violating the ACAA. This statute further describes actions open to the DOT in enforcing the ACAA: the DOT may enter an order compelling compliance, 49 U.S.C. § 46101(a) (4); revoke an air carrier's certificate, 49 U.S.C. § 41110(a)(2) (B); or impose a fine of up to $100,000 for each violation, 49 U.S.C. § 46301(a)(5)(B)(iv). Finally, Defendants argue that 49 U.S.C. § 46110(a), which permits an individual with substantial interest in an action to seek review in a U.S. court of appeals, demonstrates that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval,* 532 U.S. at 290.

Plaintiffs argue that Congress did in fact intend for there to be a private right since one has historically been recognized by the courts, and Congress has not since prohibited a private right when it has amended the ACAA. Plaintiffs agree that *Sandoval* is good law, but that *Love* and *Boswell* are mistaken in holding that Congress did not intend to create a private right under the ACAA. They suggest that *Love* and *Boswell* are in fact committing the unauthorized judicial "federal substantive lawmaking" that the Supreme Court disapproved of in *Sandoval* and that the more logical interpretation would be to conclude that Congress in fact did intend for there to be a private right. Plaintiffs rely on *Tallarico v. Trans World Airlines, Inc.,* 881 F.2d 566 (8th Cir.1989) and *Shinault v. American Airlines, Inc.,* 936 F.2d 796 (5th Cir.1991), both of which held that Congress intended for a private right to exist under the ACAA.

**\*4** *Tallarico* and *Shinault* analyzed the question using the four factor test set out in 🚩 *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):

> First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

This four factor method of analysis was overruled by *Sandoval,* which refined the analysis to the sole question of whether Congress intended to create a private right of action. 🔖 *Sandoval,* 532 U.S. at 288. However, in both *Tallarico* and *Shinault,* the district courts found the requisite legislative intent. The different outcomes result from the different sources used-*Love* and *Boswell* looked to the statutory framework of the ACAA and *Shinault* and *Tallarico* looked to legislative history. 🔖 *Boswell,* 361 F.3d at 1266 (holding that the ACAA does not establish a private right of action after examining the ACAA, accompanying regulations, and applicable case law.); 🔖 *Love,* 310 F.3d at 1359 ("Neither [*Shinault* nor *Tallarico* ] focused exclusively on whether Congress intended to create such a right to sue. Following *Sandoval,* we may not engage in a similarly wide-ranging interpretive inquiry."); 🚩 *Shinault,* 936 F.2d at 801 ("When a statute contains no remedial provision or when the remedial provision is unclear, courts must seek congressional intent from the language of the statute as a whole, legislative history of the statute, and the congressional purposes underlying the statute."); 🚩 *Tallarico,* 881 F.2d at 569-70 (agreeing with the district court that "Congress implicitly intended that handicapped persons would have an implied private cause of action to remedy perceived violations of the [ACAA]."). The D.C. and Sixth Circuits have reserved the question. *See* 🚩 *Tunison v. Cont'l Airlines Corp.,* 162 F.3d 1187, 1188 n. 1 (D.C.Cir.1998); 🚩 *Bower v. Fed. Express Corp.,* 96 F.3d 200, 204 n. 9 (6th Cir.1996).

Plaintiffs point to the legislative history of the ACAA to support their claim that the Act provides for an implied right of action. Congress first specifically prohibited discrimination by air carriers on the basis of disability when it enacted the Rehabilitation Act of 1973, which states that "no otherwise qualified individual with handicaps in the United States, as defined in Section 706(8) of this Title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance...." 🚩 29 U.S.C. § 794(a).

**\*5** In 1986, the Supreme Court held that Section 504 of the Rehabilitation Act did not automatically apply to commercial airlines because they, unlike airport operators, were not the intended recipients of federal financial assistance. *United States Dept. of Transportation v. Paralyzed Veterans of America,* 477, U.S. 597 (1986). Congress responded to *Paralyzed Veterans* by passing the ACAA later that year due to concerns that the Court's decision would leave disabled air travelers open to possible discriminatory treatment by airlines. The DOT was given authority to implement rules in furtherance of the ACAA under 14 C.F.R. Part 382.1.

Plaintiffs' argument that the contemporary legal context at the time of the ACAA's enactment should control is severely weakened by the Court in *Sandoval,* which stated that "[w]e have never accorded dispositive weight to context shorn of text. In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." 🔖 *Sandoval,* 532 U.S. at 288. In fact, Plaintiffs all but ceded their ACAA claim in their impassioned argument at bar, choosing instead to focus on their ADA and Rehabilitation Act claims. As the controlling law, *Sandoval* is clear on the matter of statutory interpretation, and Defendant's Motion to Dismiss Plaintiffs' ACAA Claim is therefore GRANTED.

## II. Americans with Disabilities Act

Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "Public accommodation" is defined to include entities affecting commerce such as "a terminal, depot, or other station used for specified public transportation" 42 U.S.C. § 12181(7)(G).

The focus of the argument over the proper statutory interpretation concerns the definitional provision at 42 U.S.C. § 12181(10) which reads:

> The term "specified public transportation" means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis.

NWA argues that the Plaintiffs' ADA claim should be dismissed as a matter of law because it is barred by the explicit text of the statute. Because plaintiffs' claims all relate to a terminal used for transportation by aircraft, NWA concludes that the ADA is simply inapplicable to its facilities or services at the terminal. This position has some support in case decisions from other courts. *See,* for example,  *Access Now, Inc. v. Southwest Airlines Co.,* 385 F.3d 1324, 1332, (11th Cir.2004) ("[A]irlines such as Southwest are largely not even covered by Title III of the ADA. Rather, airplanes and their accompanying terminals and depots are covered by another disability-access statute, the pre-ADA Air Carrier Access Act."). At oral argument, Plaintiffs proposed a narrow reading of the statute, suggesting instead that only the plain meaning of "aircraft" should be used to define the scope of the statute's exception to the entities included as public accommodations.

 **\*6** When interpreting a statute, the court must look to the plain language of the statute and apply it, unless the language is ambiguous or would lead to an absurd result.  *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 270 (6th Cir.1990).

Other courts have found that the ADA does not apply to airport terminals. *See*  *Love v. Delta Airlines,* 179 F.Supp.2d 1313, 1316 (M.D.Ala.2001) ("[A]ircraft are expressly excepted from the statutory definition of "specified public transportation.");  *Puckett v. Northwest Airlines, Inc.,* 131 F.Supp.2d 379, 382 (E.D.N.Y.2001) ("Defendants argue, logically, that the preclusion of aircraft from the definition of "specified public transportation" similarly removes airport terminals from the reach of the ADA."). However, this interpretation is inconsistent with the plain meaning of the statute.

Congress chose to exclude aircraft from the definition of "specified public transportation," but did not exclude terminals from its definition of places of public accommodation. Indeed, the NWA terminal in this case is used for bus, rail, and other motorized transport along with its principal function as a center for transportation by aircraft. This interpretation is consistent with Congress's intent to limit the ACAA's reach to aircraft and the ADA's reach to public spaces such as terminals. In fact, to conclude otherwise would leave the door open for acts of discrimination that could not be remedied. For example, NWA provides four "WorldClubs" throughout the Wayne County Airport, the largest of which is 20,000 square feet, to NWA WorldClub members. Using NWA's interpretation would permit possible discriminatory acts within the WorldClubs that would leave qualified disabled individuals without a remedy. Therefore, a clear distinction must be drawn between aircraft, which is covered by the ACAA, and the terminal, which is covered by the ADA. A precise line defining the scope of ADA coverage within the terminal and ACAA coverage attendant to aircraft can only be drawn after the parties are afforded discovery in the case.

For the aforementioned reasons, NWA's Motion to Dismiss Plaintiffs' Title III ADA claim is hereby DENIED.

### III. Section 504 of the Rehabilitation Act

Plaintiffs argue that Defendant NWA is in violation of Section 504 of the Rehabilitation Act of 1973. The Rehabilitation Act states in relevant part that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under any program or activity that either receives Federal financial assistance or is conducted by any Executive agency." NWA does not dispute that Plaintiffs are "qualified individuals with disabilities" as defined by the Rehabilitation Act, but argues that they do not receive federal financial assistance and thus the Rehabilitation Act does not apply to them. Plaintiffs argue that there is a genuine issue of material fact as to who exerts control over the airport, which is a federally assisted facility and is covered under the Rehabilitation Act.

 **\*7**  The Rehabilitation Act prohibits discrimination against persons with disabilities in any program or activity receiving federal financial assistance. 29 U.S.C. § 794. NWA argues that both the U.S. Supreme Court and the U.S. Court of Appeals for the Eleventh Circuit have found that this statute does not apply to commercial airline carriers. *Paralyzed Veterans,* 477 U.S. at 605-06 (finding commercial airline carriers are largely not covered by the Rehabilitation Act); *Shotz v. Am. Airlines, Inc.,* 420 F.3d 1332, 1334, 1336-37 (11th Cir.2005) (holding defendant commercial airline carriers, including NWA, could not be sued under the Rehabilitation Act and emphasizing that, to find otherwise would undermine the ACAA).

In *Paralyzed Veterans,* the Supreme Court overturned the Court of Appeals' ruling that the Rehabilitation Act applies to commercial airlines as recipients of federal financial assistance. 477 U.S. 597 at 604, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). The Court found that although airlines benefitted from an air traffic control system which was federally funded, the air traffic control system was "owned and operated" by the United States, and thus was not considered to be "federal financial assistance" at all. "Rather, it is a federally conducted program that has many beneficiaries but no recipients." *Id.* at 612. The Court clarified the distinction between a recipient and a beneficiary of federal financial assistance in its conclusion that the Rehabilitation Act applies to the former but not the latter:

> The statute covers those who receive the aid, but does not extend as far as those who benefit from it. In *Grove City* we recognized that most federal assistance has "economic ripple effects." We rejected the argument that those indirect economic benefits can trigger statutory coverage. 465 U.S. 555, 572, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). Congress tied the regulatory authority to those programs that receive federal financial assistance; the key is to identify the recipient of that assistance.

*Id.* at 607. NWA argues that the holding in *Paralyzed Veterans* precludes it from being covered under the Rehabilitation Act since it is only a beneficiary of federal financial assistance rather than a direct recipient. However, Plaintiffs argue that there is a question of material fact as to the level of control exerted by NWA over the airport and surrounding environs and thus discovery should be allowed to determine what level of control, if any, NWA exerts over Wayne County Airport.

Given the analysis in *Paralyzed Veterans,* discovery is necessary to assess whether it is to be distinguished from the present case. At issue in *Paralyzed Veterans* was whether the benefit of the air traffic control system could subject air carriers to the Rehabilitation Act. Here, however, Plaintiffs argue that NWA's level of utility goes far beyond the use of an air traffic control system to encompass the potential control over an entire airport facility.

Due to the unique circumstances at the McNamara terminal and the Wayne County Airport in general, the respective levels of control exerted by NWA and the Airport Authority are unclear. NWA's presence at the Wayne County Airport places it in a unique position to deny public access to a federally funded airport and airway service. Discovery is thus necessary to allow an examination of the contractual relationship between the two entities to determine whether NWA has discretion over federal funding that would qualify it as a recipient and make it subject to provisions of the Rehabilitation Act. NWA's Motion to Dismiss Plaintiffs' Rehabilitation Act claim is therefore DENIED to permit discovery.

*CONCLUSION*

**\*8**  For the aforementioned reasons, the Defendant's Motion to Dismiss is GRANTED as to the ACAA claim and DENIED as to the ADA and Rehabilitation Act claims.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4104505, 37 NDLR P 215

---

　　　　　© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3272836
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Brando VINCENT, Plaintiff,

v.

NORTHWEST AIRLINES, INC., a Foreign Profit Corporation,
Individually and d/b/a Northwest Airlines, Defendant.

No. 10–10131.
|
Aug. 19, 2010.

West KeySummary

1    **Carriers** 👈 Time Limitations

Passenger's negligence action against airline, commenced more than two years after airline's flight attendant allegedly spilled hot coffee on passenger's lap during flight, was time-barred pursuant to one-year limitations period in airline's contract of carriage. Passenger's electronic ticket for flight clearly set forth the relevant language from airline's contract of carriage regarding the one-year limitations period and passenger acknowledged that he had provided the ticket to his attorney, so passenger had reasonable notice of the limitations period. Moreover, airline was acting as a common carrier when it operated the domestic flight on which passenger was injured, so airline's contract of carriage was applicable.

**Attorneys and Law Firms**

Brian L. Fantich, Law Office of Michael G. Kelman, P.C., Farmington Hills, MI, for Plaintiff.

Daniel J. Seymour, David R. Baxter, Nagi, Baxter, Detroit, MI, for Defendant.

***ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT***

PATRICK J. DUGGAN, District Judge.

**I. Introduction**

**\*1** On October 22, 2009, Brando Vincent ("Plaintiff") filed a complaint against Northwest Airlines, Inc. ("Northwest") in Wayne County Circuit Court alleging several claims. The claims are based on two separate incidents. The first incident took place on Northwest Flight # 289 on September 7, 2007, when hot coffee spilled on Plaintiff's lap. The second incident occurred when Plaintiff allegedly purchased a first class ticket on a flight from Honolulu to Chicago, and Northwest refused to provide him with a first class seat.[1] On January 13, 2010, Northwest timely removed Plaintiff's complaint to this Court based on diversity jurisdiction. *See* 📖 28 U.S.C. §§ 1441, 📖 1446. On June 15, 2010, Northwest filed a motion for summary judgment

pursuant to Federal Rules of Civil Procedure 56. Plaintiff responded to the motion on July 6, 2010, and Northwest filed a reply brief on July 13, 2010. The Court held a motion hearing on August 11, 2010. For the reasons that follow, the Court grants Northwest's motion for summary judgment.

## II. Factual and Procedural Background

On September 7, 2007, Plaintiff was a passenger on Northwest flight # 289 from Detroit to Memphis. Plaintiff alleges that there was a high degree of turbulence during the flight, and the flight attendant spilled coffee on Plaintiff's lap. The flight attendant contends that Plaintiff spilled the coffee on himself. Plaintiff claims that he sustained "serious and disabling burn injuries resulting in permanent scarring" from the incident. (Pl.'s Resp. at 5.) Based on this incident, Plaintiff alleges in his complaint "Negligence and Gross Negligence, Negligent Hiring and Training" and Negligent and/or Intentional Infliction of Emotional Distress.

## III. Legal Standard

Summary judgment is appropriate only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving part has the initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. Once the moving party meets this burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-moving party must present sufficient evidence upon which a jury could reasonably find for the non-moving party; a "scintilla of evidence" is insufficient. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

**\*2** The court must accept as true the non-moving party's evidence and draw "all justifiable inferences" in the non-moving party's favor. *See id.* at 255, 106 S.Ct. at 2513. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.* at 255, 106 S.Ct. at 2514.

## IV. Discussion

Based on undisputed facts, Northwest argues that Plaintiff's claims are precluded by the parties' contract. Northwest also argues that Plaintiff has alleged no facts to support his gross negligence or the negligent and/or intentional infliction of emotional distress claims.

Northwest argues that Plaintiff's claims are time-barred pursuant to the one-year limitations period in its travel agreement with Plaintiff. Plaintiff filed this action on October 22, 2009, more than two years after the incident occurred.

Federal law provides that "an air carrier may incorporate by reference in a ticket or written instrument any term of the contract for providing interstate air transportation." 49 U.S.C. § 41707. The incorporated terms may include claim restrictions, specifically time periods within which passengers must bring an action. *See* 14 C.F.R. § 253.5(b)(2). Under Sixth Circuit precedent, a carrier may limit its liability to passengers in a ticket or other written instrument only if "the carrier has made a 'reasonable' effort to warn passengers of the notice and filing requirements." *Barbachym v. Costa Line, Inc.,* 713 F.2d 216, 219 (6th Cir.1983).

In the present case, Plaintiff's electronic ticket clearly stated: "Northwest Airlines Notice of Incorporated Terms ... Incorporated terms include but are not restricted to ... [c]laim restrictions, including time periods in which you must file a claim or sue Northwest." (Def.'s Mot. Ex. B.) The terms in the electronic ticket explained that the incorporated terms could be found in the Northwest Airlines Passenger Contract of Carriage which was available online at Northwest's website, at any Northwest airport, or by requesting a copy from Northwest by mail. (*Id.*) The relevant incorporated terms found in Northwest's contract of carriage state:

A) Personal Injury and Death

No action shall be maintained for injury to or death of any passenger unless:

1) Notice of the alleged occurrence of events resulting in the claim is presented in writing to the general offices of the carrier alleged to be responsible within 90 days, *and;*

2) Action regarding the claim commences within one year of its alleged occurrence.

(*Id.* Ex. F) (emphasis added).

In response, citing 📖 *Sweitzer v. Pinnacle Airlines, Inc.,* No. 09–469, 2010 U.S. Dist. LEXIS 46983, 2010 WL 1949613 (W.D.Mich. May 13, 2010), Plaintiff argues that the one-year limitation period in Northwest's contract of carriage is not enforceable. In *Sweitzer,* on or about April 2, 2009, the plaintiffs sued Pinnacle Airlines, doing business as Northwest Airlink and Northwest Airlines, Inc., for negligence and gross negligence and breach of warranty based on an incident that took place on April 12, 2007, when the plane on which the plaintiffs were passengers, overran the runway landing. *Id.* at *1–2. Pinnacle filed a motion for summary judgment arguing that the plaintiffs' claims were time barred because the contract of carriage between Pinnacle and the plaintiffs provided a one year time limit to bring claims.

**\*3** Although the plaintiffs failed to bring their action within one year, the district court rejected Pinnacle's argument finding that the airline failed to prove that the plaintiffs had notice of the time limit. In order to prove reasonable notice, Pinnacle had provided the court with an exemplar of e-ticket/transportation documents issued by Northwest Airlines because the plaintiffs' original electronic tickets were not available. *Id.* at *8–9. Pinnacle, however, failed to provide an affidavit or other document attesting to the validity of the exemplar. *Id.* at *9. The court held that Pinnacle's claim limitation argument failed for three reasons: 1) Pinnacle failed to authenticate the exemplar document; 2) the exemplar document only applied to Northwest Airlines and not to Pinnacle Airlines which "operated the [plaintiffs'] flight and was in sole control" of the flight; and 3) Northwest's contract of carriage was irrelevant because the plaintiffs were not suing Northwest Airlines as a common carrier but rather Pinnacle.[2] *Id.* at *10. In the current matter, Plaintiff argues that *Sweitzer* contains the same legal issue and, for this reason, the Court should find the electronic ticket inadmissible, reject Northwest's timeliness argument, and deny Northwest's motion for summary judgment.

This Court finds *Sweitzer* distinguishable and not applicable for three reasons.[3] First, *Sweitzer* is an unpublished Western District of Michigan decision; therefore, it is not binding on this Court. Second, in the present matter, Northwest attached Plaintiff's actual electronic ticket/boarding pass to its motion. (*See* Def.'s Mot. Ex. B.) Plaintiff identified these documents at his deposition and acknowledged that he had given them to his attorney. (*See Id.* Ex. A at 12–13.) Third, Plaintiff's lawsuit is against Northwest for conduct that allegedly occurred while Plaintiff was on a flight operated and controlled by Northwest. Therefore, Northwest was acting as a common carrier. Thus, the contract of carriage presented to the Court applies to this dispute.

Plaintiff argues, however, that Northwest had notice of his claim within one year. Northwest's contract of carriage requires that *notice* of a claim be provided within 90 days *and* that an *action* concerning the claim commence within one year from the time of the occurrence. Although Plaintiff may have notified Northwest of his claim within one year, he commenced this action

on October 22, 2009, more than two years after the occurrence of the incident on September 7, 2007. Therefore, this Court concludes that all of Plaintiff's claims relating to the September 7, 2007 flight are time-barred.

**V. Conclusion**

For the reasons set forth above, the Court grants Northwest's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED,** that Northwest's motion for summary judgment is **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3272836

Footnotes

| | |
|---|---|
| 1 | In Plaintiff's response brief to Northwest's motion for summary judgment, Plaintiff concedes that this second incident never occurred. Therefore, the Court will not discuss this incident or Plaintiff's claims based on this incident further. |
| 2 | The plaintiffs were suing Northwest as a provider of Aviation Weather Reports and Pinnacle as the common carrier. |
| 3 | Plaintiff contends that Northwest's counsel had an ethical obligation to cite all adverse cases, specifically the *Sweitzer* case. Contrary to Plaintiff's assertions, Northwest had no ethical obligation to cite this case because it is distinguishable and not binding on this Court. |

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.